670 So.2d 6 (1995)
Thomas E. VICE
v.
Frank M. LEIGH.
No. 92-CA-00534-SCT.
Supreme Court of Mississippi.
November 30, 1995.
Rehearing Denied March 14, 1996.
J. Douglas Ford, Mitchell McNutt Threadgill Smith & Sams, Gary L. Geeslin, Lipscomb Geslin & McClanahan, Columbus, for appellant.
Lee B. Hazlewood, William Liston, Liston/Lancaster, Winona; and Charles T. Yoste, Starkville, for appellee.
BEFORE HAWKINS, C.J., and JAMES L. ROBERTS, Jr., and SMITH, JJ.
HAWKINS, Chief Justice, for the Court:
Thomas E. Vice has appealed a judgment of the chancery court of Lowndes County finding that Frank M. Leigh had a right to cancel a lease agreement with right to renew between the two, and also erect a fence between properties leased by Vice and owned by Leigh. We reverse and render on the former and affirm on the latter.

FACTS
This case involves a lease agreement for a 15-year period, June 27, 1977-June 27, 1992, with option to renew for a like period. On August 8, 1990, Leigh wrote Vice that he was in default because he had sublet the premises to Bobby W. Eidson without obtaining Leigh's prior written consent, had damaged the parking area, and had been delinquent in *7 the payment of ad valorem taxes for which he was responsible under the lease.[1]
On September 21, 1990, Leigh filed suit in the chancery court of Lowndes County seeking a declaratory judgment that he had a right to cancel the lease agreement with option to renew. Leigh subsequently abandoned any effort to have the court declare the lease itself forfeited, concentrating instead on his contention that he had no obligation to renew the lease because of the breaches by Vice. Vice answered October 24 and also counter-claimed, alleging that Leigh had improperly constructed a fence dividing the commercial properties owned by Leigh, and part of which had been leased by Vice.

NARRATIVE EVENTS
In 1976, Leigh, Vice and Thomas R. Ferguson agreed to develop a parcel of property owned by Leigh on Bluecutt Road in Columbus. As part of the agreement, Vice constructed three commercial structures at what became known as 3502, 3504 and 3506 Bluecutt Road. A common parking lot was also constructed in front of all three buildings.[2] Thereafter, Leigh leased the property at 3502 Bluecutt Road to Vice and Ferguson for a term of fifteen years on June 28, 1977.
The lease stated in relevant part:
Lessees shall not assign this lease nor sublease said premises in whole nor any part thereof without the written consent of Lessor; provided, however, such consent shall not be unreasonably withheld.
... .
In the event of default by Lessees in payment of any installment of rent accruing under the terms of this lease, or in the event Lessees should fail to perform or observe any other covenant, agreement or obligation assumed under the terms of this lease and such default shall continue for a period of 30 days, or in the event of the insolvency of the Lessees, or the adjudication of the Lessees to be bankrupt, whether such adjudication be voluntary or involuntary, or in the event of a judgment against Lessees remaining unsatisfied and without appeal for more than 30 days after its entry, or in the event of an abandonment of the leased premises by Lessees, then in any such event, Lessor shall have the right to declare the rights of Lessees under this lease forfeited and cancelled [sic] and to re-enter into possession of the demised premises. In such event, Lessor may re-let said premises or make such other use of it as he may consider expedient under the circumstances and Lessees shall be liable for the full guaranteed to Lessor by the lease together with all the Lessor's costs, including reasonable attorney's fees, less whatever amount Lessor should derive from the subsequent reletting or re-use of said property for the remainder of this lease.
... .
In consideration of the covenants and rental payments provided herein, Lessor does hereby grant unto the Lessees the right at their option, to renew this lease for an additional period of 15 years beginning the 28th day of June, 1992, and terminating the 27th day of June, 2007, upon the same terms and conditions as herein provided, except for the provisions providing for an option of renewal and except for the rental ...
(a) Lessees, in order to exercise this option to renew, must give written notice of their intention so to do at least three months prior to the expiration of the primary term of this lease;
(b) In order to avail themselves of the right of this option to renew, Lessees must have made all rental payments when due and must have complied with and performed all of the covenants premises and agreements of this lease. In the event of any delinquency in the payment of rentals or any violation of nonperformance of the covenants of this agreement, the right of Lessees to renew shall be forfeited and Lessor shall be under no obligation to renew this lease as specified above.

*8 The covenants and agreements contained in this lease are interdependent and are binding on the parties hereto, their heirs and assigns.
A business, the "House of Lights," was a sub-tenant of Vice and Ferguson and occupied the 3502 property, at the time the June 1977 lease was executed.[3] Leigh raised no objection to the House of Lights.
In 1979, House of Lights vacated the 3502 property. The property was then sub-let to Magnolia Lighting. Vice and Ferguson did not obtain Leigh's consent prior to sub-leasing the property. However, Leigh raised no objection to the sub-lease.
In 1986, Ferguson assigned his entire interest in the 3502 property to Vice without Leigh's prior approval. Thereafter, Vice notified Leigh of the assignment. Leigh raised no objection. At the same time, Vice gave notice to Leigh that he intended to renew the lease.
Magnolia Lighting vacated the 3502 premises in 1987. On June 24, 1988, Vice sublet the property to Bob W. Eidson without Leigh's prior approval. By a letter date November 5, 1988, however, Vice did inform Leigh that he had sub-let the property to Eidson: "My lease with Edison [sic] is a triple net lease, in which, he pays all taxes, insurance, and upkeep on the building." A similar letter was sent to Leigh on December 2, 1988. Thereafter, in 1989, Leigh constructed the fence across the parking lot, dividing the other property from the 3502 premises. On August 8, 1990, Leigh informed Vice that he was in default on the lease, partly because of the unauthorized sublease to Eidson.
At trial, the following colloquy took place:
LEIGH
BY MR. LISTON:
Did you ever give your consent to the sublease of those buildings to Mr. Eidson?
BY MR. LEIGH:
No. No, sir.
BY MR. LISTON:
At any time during the primary term of the 1977 lease did you give Mr. Vice and Mr. Ferguson notice of what you considered to be default in terms of that lease by them? And, in that connection, I want to hand you Exhibit No. 11 in evidence.
BY MR. LEIGH:
I construed the August 8, 1990, letter from me to Mr. Ferguson and Mr. Vice as notification that they were in default.
(T. 70-71)
CROSS-EXAMINATION:
BY MR. GEESLIN:
Mr. Leigh, the document in front of you, Exhibit No. 28, [dated December 2, 1988] is there reference in that letter to Bob Eidson doing business as Eidson Chemical and Office? Is that correct?
BY MR. LEIGH:
That's correct.
BY MR. GEESLIN:
All right, sir. And did you voice any objection to Mr. Vice at the time about the occupancy of No. 3502, Building No. 1 by Mr. Eidson?
BY MR. LEIGH:
I have never approved Mr. Eidson.
BY MR. GEESLIN:
Excuse me. My question is did you voice any objection 
BY MR. LEIGH:
Yes, I did to Mr.  Yes, I did voice my objection to Mr. Vice when Mr. Vice sought me out to tell me about this and to ask me if I would participate in an expenditure of Mr. Eidson ...
... .
BY MR. GEESLIN:
Are you unable to tell us, sir, when you objected first to him to Mr. Vice?

*9 BY MR. LEIGH:
I objected to  I don't know when I objected to  Whenever I was asked, I objected. He may know when I objected. I don't. I objected when he asked me.
BY MR. GEESLIN:
So you say Mr. Vice would know?
BY MR. LEIGH:
Yes.
VICE
BY MR. GEESLIN:
If you know, looking at the lease dated June 24, 1988, when did you inform Mr. Leigh of the fact that Mr. Eidson was leasing Building No. 1?
BY MR. VICE:
I don't know that I informed him. He contacted me about an insurance  wanting to be sure we had some insurance on it, was he covered under the lease as the lease stated, and I told him I thought so, and I would get that for him. I don't remember the dates on it. He voiced no objection to Mr. Eidson at all in the beginning. It was months after Mr. Eidson had been there. It was  He began to voice an objection when he and Mr. Eidson had words.
BY MR. GEESLIN:
Well, when if ever, did he voice an objection to you about it?
BY MR. VICE:
He's never voiced an objection to me until he sent this letter, I believe in August of 1990. That's the when he objected to me.

THE FENCE
At the time the property was initially developed, a common parking lot easement was entered into which covered the parking lot space in front of 3502 and 3504 buildings. The agreement did not expressly cover the lot in front of 3506 building. Vice constructed a parking lot in front of all three lots. Vice sent Leigh a letter on November 7, 1977, which informed Leigh of the cost of his share of the parking lot. Vice paid two-thirds of the cost, while Leigh paid one third of the cost, representing the portion of the parking lot in front of 3506. Initially, the parking lot was used by customers and employees of all three businesses.
After Eidson moved to the 3502 property in 1988, Leigh constructed a fence across the parking lot which divided the 3506 property from the 3502 and 3504 parcels.

NON-RENEWAL
By a letter dated August 8, 1990, Leigh informed Vice that he was in default and that he had forfeited the original term and his renewal option. Specifically, Leigh alleged that rental payments had not been timely, ad valorem taxes had not been paid timely, and the sub-lease to Eidson had not been approved by Leigh. At trial, Vice conceded that all of the rental payments had not been prompt over the fifteen years of the lease, and that the ad valorem taxes were paid late during 1982, 1984, and 1985. At the time of trial, however, Vice asserted, and the court so found, that all rentals and ad valorem taxes were current.
At the conclusion of the trial held in April 1992, the chancellor first noted that under the express terms of the lease agreement Vice had an obligation not to sublease without the written consent of Leigh, with the further proviso that such consent would not be unreasonably withheld. He further found that Vice had sublet the property to Eidson without obtaining the consent of Leigh. He then found that Leigh at his first knowledge of Vice's subletting to Edison voiced an objection, and at no time consented thereto. He concluded that Leigh had not waived any right he had not to renew the lease because of the breach by Vice. He also held that Leigh had a right to erect the dividing fence.
Vice has appealed.

LAW

I. RENEWAL OF LEASE
From the uncontradicted evidence it is clear that, while Vice did not seek the prior approval of Leigh before subletting the 3502 premises to Edison June 24, 1988, he did inform Leigh verbally and by letters in November and December 1988 that he had sublet *10 the property to Eidson. Also, Leigh was actually aware that Eidson was occupying the premises from seeing him on the property. Yet, he made no protest until August 8, 1990, when he wrote Vice. The question then arises is whether, by this belated response to Vice's breach of the terms of the lease, Leigh waived his right to cancel the agreement or refuse to renew.
The chancellor manifestly erred in his finding that Leigh voiced an objection when he first had knowledge that Eidson was on the property, because the uncontradicted evidence is to the contrary.
Clearly Vice violated the terms of the lease prior to 1990. He entered into three subleases without Leigh's approval; he failed to pay the property taxes promptly; and he failed to pay the rent on time. Equally apparent is that Leigh acquiesced in Vice's conduct prior to August 1990. Although he may not have been pleased, Leigh made no attempt to enforce his rights under the lease. Consequently, Leigh waived his right to object Vice's conduct. See Canizaro v. Mobile Communications Corp. of America, 655 So.2d 25 (Miss. 1995) (holding that party may waive right to which he would otherwise have been entitled); Delta Wild Life & Forestry, Inc. v. Bear Kelso Plantation, Inc., 281 So.2d 683, 686 (Miss. 1973) (holding that lessor who knew of and acquiesced in breach could not terminate lease); Senter v. Propst, 190 Miss. 190, 207-09, 197 So. 100, 104 (1940) (holding that lessor could not declare forfeiture for non-payment after six-year silence); Adams v. Graham Stave & Heading Co., 160 Miss. 266, 272, 135 So. 198, 199 (1931) (holding that lessor waived right to object to sublease by conduct).
Nevertheless, Leigh contends that any waiver of rights during the original term of the lease would have no impact on his ability to prohibit Vice from renewing for an additional term.[4] In support of his position, Leigh cites Gadsden Bowling Center, Inc., v. Frank, 249 Ala. 435, 31 So.2d 648, 651 (1947), in which the Alabama Supreme Court held:
It would be inequitable or improper to require a landlord to extend the lease when the tenant has proved to be an undesirable tenant and has violated covenants contained in the lease for the protection of the landlord, especially when performance is made a condition precedent to extension. In these circumstances strict performance is required by the tenant.
`And a performance which may serve to prevent a forfeiture of the lease is not the measure of performance required by a provision which makes faithful and legal performance the condition of an extension of a lease.' 35 C.S. 1018, § 145.
It is claimed that acceptance of rent after default and the failure to assert other grounds of forfeiture are waived by the failure of the landlord to declare a forfeiture of the original lease. This is not in accordance with well-considered decisions.
See also Homstead Enterprises v. Johnson Products, Inc., 540 A.2d 471, 472-73 (Me. 1988) (holding that failure to assert default during original term did not preclude lessor from contesting option to renew); Hindquarter Corp. v. Property Development Corp., 95 Wash.2d 809, 631 P.2d 923, 925 (1981) (holding that right to declare forfeiture and right to refuse renewal are distinct).
Similarly, the Nevada Supreme Court has held:
[T]he distinction must be observed between a waiver of the right to terminate the lease and a waiver of the conditions precedent to the lessee's right of renewal. A waiver is the intentional relinquishment of a known right. If intention is to be implied from conduct, the conduct should speak the intention clearly. Acceptance of rent clearly speaks an intent not to terminate a lease ... But it cannot be said that acceptance of rentals or other performance speaks any intent to release a lessee from an unrelated promise or condition ... `The neglect of the landlord to strictly enforce his right of forfeiture for breach of condition does not entitle the tenant to a renewal when such renewal is dependent upon faithful performance of conditions.'
Reno Realty & Investment Co. v. Hornstein, 72 Nev. 219, 301 P.2d 1051, 1054-55 (1956) *11 (citations omitted). The question then becomes whether the conditions precedent to the renewal option may themselves be waived as some courts have held. Rowe v. Ben's Truck Stop, Inc., 197 Ga. App. 514, 398 S.E.2d 760, 761 (1990) (holding that condition precedent to renewal option may be waived).
Other states, however, have adopted a contrary position. In Steven W. Barrick & Associates v. Witz, 147 Ill. App.3d 615, 101 Ill. Dec. 414, 498 N.E.2d 738 (1986), the lessor sought to prevent the lessee from renewing due to a number of instances of misconduct by the lessee. The Illinois Court of Appeals found:
At issue, then, is whether waiving a breach of an existing lease, rather than declaring an immediate forfeiture, precludes a lessor from using that breach as a ground for terminating the lease at the end of the lease term when the lessee holds an option to renew.
This court has held that a lessor may not revive grounds for forfeiture which he previously waived in order to prevent lessee's exercise of an option to purchase.
... .
Under Illinois law, then, waiver principles clearly apply to options to renew a lease, and conditions or breaches of conditions which are waived by the lessor cannot be revived to prevent exercise of the renewal option ... [Otherwise] [i]t would permit a lessor to acquiesce in, or even encourage, deviations from lease terms by the lessee, and then rely on those very deviations to refuse renewal of the lease.
Witz, 101 Ill.Dec. at 416-17, 498 N.E.2d at 740-41; see also Spotts v. Westlake Garage Co., 116 Wash. 255, 199 P. 294, 297-98 (1921) (holding that lessor's failure to demand security deposit as required by lease prevented lessor from relying upon those grounds in denying renewal); 49 Am.Jur.2d Landlord and Tenant § 188 (1995) (stating that waived breach cannot be basis for denying renewal).
We conclude that the latter line of cases state the better rule. While Vice was obligated to secure the prior approval of Leigh before subletting the property, Leigh was likewise obligated not to unreasonably refuse permission to do so. This evinces an intent of the parties that in the absence of some good reason, Vice would be permitted to sublet the property. Therefore, when Leigh learned that Vice had in fact sublet the property, if he had any objection, he should have voiced it to Vice and informed him. Likewise, if he had any objection to Vice's subletting the property without his prior written consent, he should have said something to Vice when he had done so with the tenants preceding Eidson. To permit Leigh to say nothing until the original term of the lease was near its expiration date would give him an unfair advantage, to withhold or grant renewal depending upon whether or not it was advantageous business-wise to do so. The parties had contracted that Vice, not Leigh, would have the right to decide whether or not he wished to renew the lease.
Where conditions or breaches of conditions are waived by the lessor during the term of the lease, they cannot be revived to prevent exercise of the renewal option. In the instant case, the lease required strict compliance with all the covenants therein before Vice could exercise the renewal option. There is no doubt that Vice failed to fully comply with all the covenants. Leigh certainly could have demanded strict performance. But once he was made aware of Vice's breaches, Leigh should have objected during the course of the lease agreement.[5] Thus, it was erroneous for the chancellor to find that waiver was not a defense.

II. PARKING AGREEMENT
Vice also contends on appeal that in erecting the fence Leigh deprived him of parking space to which he was entitled. *12 While Vice did pay for the construction of the parking lot to the buildings, Leigh reimbursed him for the portion in front of 3506. Vice had no interest in the 3506 property. The erection of the fence did not impede ingress and egress on the 3502 and 3504 properties, or their respective parking lot areas.
There was nothing in writing giving Vice any right, title or interest in and to the parking area in front of the 3506 property. He offered no evidence supporting an easement, actual, implied, or by prescription. Dethlefs v. Beau Maison Development Corp., 511 So.2d 112, 116 (Miss. 1987). All he ever had, if anything, was a revocable license. Logan v. McGee, 320 So.2d 792, 793 (Miss. 1975); Towles v. Hodges, 235 Miss. 258, 108 So.2d 884, 885 (1959). There was no agreement, and nothing about Leigh's or Vice's conduct giving Vice a license coupled with an interest in the parking lot in front of the 3506 property. Anchor Stone & Materials Co. v. Carlin, 436 P.2d 650, 653 (Okla. 1967). The chancellor correctly held that Leigh had the right to erect the fence.
We therefore reverse and render the chancellor's judgment holding Vice did not have the right to renew the lease under the agreement, and affirm the chancellor's ruling that Leigh had a right to erect the fence.
REVERSED AND RENDERED IN PART; AFFIRMED IN PART.
SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
DAN M. LEE, P.J., and McRAE, J., concur in result only.
PRATHER, P.J., not participating.
NOTES
[1] The letter was actually addressed to Vice and Richard Ferguson, but Ferguson no long had any interest as lessee and played no part in the subsequent litigation.
[2] Leigh paid Vice for the 3506 building, and for the portion of the parking lot at 3506 Bluecutt.
[3] An initial lease between Leigh, Vice and Ferguson was executed on February 27, 1976. This lease covered the 3502 property. For some reason, however, the lease was rescinded by the parties, and the June 28, 1977 lease was executed. At the time of the June 28, 1977 lease, House of Lights was already occupying the 3502 property as a sub-lessee of Vice and Ferguson under the February 27, 1976 lease.
[4] The Court has not previously expressed an opinion on this matter.
[5] For example, Vice demonstrated his intention to renew the lease for an additional term in 1986. In 1988, when Vice sublet the property to Eidson without prior approval  a totally new breach  Leigh could have declared a default of the renewal option. Again, he elected not to do so. Only in 1990  four years after he received notice of the intention to renew and two years after the sublease to Eidson  did Leigh assert a forfeiture of the renewal option. Because Leigh did not object at the time he learned of the breach, he has waived his right to assign this ground as a basis for not honoring the renewal provision.