# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-CA-01765-SCT

*ROBERT A. BENNETT AND WIFE, MARY ALICE BENNETT*

*v.*

*WAFFLE HOUSE, INC., A GEORGIA CORPORATION*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 09/24/1998 |
| TRIAL JUDGE: | HON. JASON H. FLOYD, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | MICHAEL T. DAWKINS |
| ATTORNEYS FOR APPELLEE: | BEN ELLIS SHEELY |
| | KYLE STUART MORAN |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | MOTION FOR REHEARING DENIED. AFFIRMED - 11/22/2000 |
| MOTION FOR REHEARING FILED: | 06/08/2000 |
| MANDATE ISSUED: | 11/30/2000 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. Robert A. Bennett and his wife, Mary Alice Bennett, (the Bennetts) have moved this Court for a rehearing of the May 25, 2000, per curiam affirmance of the judgment below. The motion for rehearing is denied.

¶2. The Bennetts appeal the chancellor's decision that the addition of eighteen seats to a thirty-three-seat Waffle House restaurant by Waffle House, Inc. (Waffle House), the Bennetts' lessee, did not violate the lease contract which contemplated the construction of a "standard Waffle House." The judgment of the chancery court is affirmed.

### FACTS AND PROCEEDINGS BELOW

¶3. This is a dispute over a contract formed in 1974, when Waffle House leased property in Biloxi from the Bennetts on which to construct a restaurant. The lease was for a fifteen-year term renewable thereafter by Waffle House for seven terms of five years each. The rent was fixed per month for the primary term, with the rent for the renewal terms to be adjusted upward according to changes in the Consumer Price Index. The Bennetts designated Sawyer Real Estate as their agent for receipt of the rental payments.

¶4. The lease agreement did not specify the number of seats the restaurant would have. However, the lease agreement twice referred to a "standard Waffle House." Bennett argues that this term limited the restaurant to thirty-three seats, and that the two expansions of the restaurant (to 43 seats in 1976 and 51 seats in 1993) therefore breached the lease agreement so as to render it null and void.

¶5. When the lease came up for renewal in 1989, the Bennetts refused to accept the rental payments until resolving the matters of Waffle House's alleged breaches. In December, 1989, Waffle House chose to exercise the first of the lease agreement's seven renewal options. Waffle House computed the monthly rental due according to the terms of the lease and forwarded a draft to real estate agent Lenwood Sawyer for the December rent. The Bennetts refused to accept the December payment.

¶6. After receiving the January rental payment, Sawyer filed this interpleader action on January 16, 1990, which named the Bennetts and Waffle House as defendants and requested the court to interplead the funds and determine the parties' entitlements. Waffle House cross-claimed against the Bennetts for their refusal to accept rental payments under the lease, and the Bennetts cross claimed against Waffle House to cancel the lease.

¶7. The Harrison County Chancery Court granted summary judgment in favor of Waffle House in 1991, finding that Waffle House did not breach the lease agreement. On appeal, the Mississippi Court of Appeals reversed the trial court's grant of summary judgment in an unpublished decision, ***Bennett v. Sawyer Real Estate, Inc.***, 687 So.2d 763 (Miss. Ct. App. 1996) (mem.), and this Court denied certiorari, 691 So.2d 1028 (Miss. 1996) (table).

¶8. On remand, the chancellor found that the only ambiguous term in the lease was the phrase "standard Waffle House." After hearing evidence on the matter, the chancellor agreed with the Bennetts that the phrase "standard Waffle House" meant a restaurant with thirty-three seats. The court went on to hold that Waffle House did not breach the agreement in making improvements to the building (i.e., that the parties had not contracted to limit the size of the building). The Bennetts have appealed with respect to the issues regarding breach of the lease agreement.

¶9. The Bennetts are aggrieved by the trial court's exclusion of extrinsic evidence concerning the phrase "standard Waffle House," and the chancellor's ruling that the parties had not contracted to limit the size of the seating capacity. They raise three issues with various sub-issues.

¶10. Because we find that the chancellor was correct in finding that the parties had not contracted to limit the size of the building and that the lease was a ground lease, we will not address most of the issues raised, as this issue is dispositive. Thus, the exclusion of any extrinsic evidence to prove the meaning of the phrase "standard Waffle House," if error, was harmless.

**DISCUSSION**

**I. Expansions of the Restaurant's Seating Capacity**

¶11. The chancery court correctly decided that additions to the building in excess of thirty-three seats did not breach any of the lease provisions. For this reason, we affirm the judgment of the chancery court.

¶12. The Bennetts argue that the lease expressly limits the restaurant to a "standard Waffle House" and that Waffle House stipulated that a "standard Waffle House" was one with thirty-three seats. The trial court

ruled to the contrary, holding that "[t]he term 'standard Waffle House' is only descriptive in nature, and without further limitations does not denote a restriction on seating capacity."

¶13. Waffle House argues that the lease was a ground lease. The Bennetts leased the property, an 80 feet by 300 feet lot, to Waffle House, and Waffle House was responsible for improvements which were the personal property of Waffle House. Waffle House points out that paragraph 5 of the lease provides that the lease is a "land lease only" and the lessor "does not agree to make any improvements erected or made on premises by Lessee."

¶14. The only restriction in the lease was that any improvements be constructed on the westerly 60 feet of the property. Therefore, Waffle House argues, absent an express limitation in a lease provision specifying a maximum number of seats for the restaurant, the lease did not limit the number of seats and did not prohibit the expansions.

¶15. The Bennetts contend that the trial court erred in applying *Ewing v. Adams*, 573 So.2d 1364 (Miss. 1990), to the instant case. In *Ewing*, the lease specified that the property was to be used for a drive-in theater but the lessee instead used it as a flea market. The Court held that restrictions intended to limit the use of property to a particular purpose should not be left to implication, but should be clearly defined and understood by the parties. The Bennetts argue that the instant case, unlike *Ewing*, does not involve the **use** of the property, and the issue is therefore whether the lease restricted the **size** of the building. The Bennetts are incorrect, and the fundamental principles of *Ewing* are applicable here.

¶16. In *Ewing*, this Court held that "The landlord is free to impose the restrictions on the tenant's use of the property, but in light of the principle which gives the tenant free use, any restrictions are construed narrowly against the landlord." *Id.* at 1368. We went on to state the rule to be applied in interpreting use-restricting lease provisions:

> Applied to the specific instance in which a lease provision sets forth the use of the property, the authorities are in agreement that such a provision, absent a clear and specific indication that the landlord intended to limit the tenant's use of the property, is generally permissive and not restrictive.

*Id.* at 1368.

¶17. Here, as in *Ewing*, the lease described the use to which the property was to be put, but does not contain a "clear and specific indication" that the description was intended to limit the use to a thirty-three-seat restaurant. While it is established that in 1974 a "standard Waffle House" consisted of thirty-three seats, there is no clear indication in the lease that this language was intended as a limitation. Therefore, the Bennetts and Waffle House did not contract to limit the use of the property to a thirty-three-seat restaurant. The law requires that such restrictions be unambiguous in their intent to limit a lessee's use, and that such provisions are to be construed against the landlord.

### II. The "Sale/Lease-Back" Agreement Between Waffle House and Charles C. Hightower

¶18. Bennett next contends that a sale/leaseback to Charles C. Hightower violated Section 4 of the lease. That section of the lease provides that the lessee may place a first mortgage on the building: "However, Lessee agrees that Lessor may pay off the mortgage owned by Lessee on the building and assume the right and privileges of the mortgage holder."

¶19. In 1976, Waffle House entered into an agreement whereby it sold its building to Charles Hightower and subsequently leased it back from him. The Bennetts first objected to this arrangement almost fifteen years later by a letter in 1990, in which they requested that they be allowed to pay off the mortgage. Waffle House refused. We need not decide whether this arrangement constitutes a "hidden mortgage" as the Bennetts contend because the Bennetts have waived their right to object to this alleged violation of the lease by waiting until almost fifteen years to do so.

¶20. In *Vice v. Leigh*, 670 So.2d 6 (Miss. 1995), Leigh leased commercial property to Vice for a term of fifteen years with an option to renew for an additional fifteen years. The lease also contained a provision forbidding the subletting of the property without the consent of the lessor.

¶21. In 1990, Leigh informed Vice that he was in default and had forfeited his rights under the lease including the right to renew. Not only had Vice sublet the property three times without Leigh's permission, he had also been late with some of the rental payments and had, on three occasions, paid the ad valorem taxes late. Notwithstanding Leigh's arguments to the contrary, this Court held that Leigh had waived his right to object to the violations.

> Clearly Vice violated the terms of the lease prior to 1990 . . . Equally apparent is that Leigh acquiesced in Vice's conduct prior to August 1990. Although he may not have been pleased, Leigh made no attempt to enforce his rights under the lease. Consequently, Leigh waived his right to object Vice's conduct.

*Vice*, 670 So.2d at 10 (citations omitted).

¶22. "To permit Leigh to say nothing until the original term of the lease was near its expiration date would give him an unfair advantage to withhold or grant renewal depending on whether or not it was advantageous business-wise to do so. The parties had contracted that Vice, not Leigh, would have the right to decide whether or not he wished to renew the lease." *Vice*, 670 So.2d at 11. The ultimate lesson of *Vice v. Leigh* is that a lessor who fails to object to breaches of a lease during the lease agreement cannot then prevent exercise of a renewal option on the basis of those breaches. *Id.*

¶23. *Vice* is directly applicable to the case at bar. The Bennetts claim, as did Leigh, that violations of the lease agreement committed throughout the course of a fifteen-year lease give them the right to disavow an option to renew once the primary term of the lease expires. However, if the Bennetts truly objected to the agreement they should not have waited until 1990 to cry foul. Therefore, they have waived the right to object.

### III. Harmony Clause

¶24. Finally, the Bennetts argue that Waffle House has violated a "harmony clause" in the lease by violating the laws of the City of Biloxi, which set specifications for the width of driveways and the depth of parking spaces. This argument lacks merit because it is merely a pretext for the relief sought by the Bennetts.

¶25. The D.C. Court of Appeals addressed "pretextual forfeitures" in *Entrepreneur, Ltd. v. Yasuna*, 498 A.2d 1151 (D.C. 1985). There the landlord attempted to declare a forfeiture in order to raise the rent. The plaintiff had leased a townhome in which he ran a business for a term of five years. When the landlord ran into financial problems, she attempted to collect a greater rent on the property. When this failed, she sold the property and attempted to terminate the leasehold on the grounds that Plaintiff was unlawfully running a

business out of the property in violation of zoning regulations.

¶26. The D.C. Court of Appeals held that the lease was not forfeited because of a breach of the "unlawful purpose" covenant. In so holding, the court determined that the lessor's reason for terminating the lease was merely a pretext to gain advantage for herself.

> For example, in *Kearns v. Barney's Clothes, Inc.*, 38 Misc. 787, 789-791, 239 N.Y.S.2d 318, 320-22 (1963), an action for possession based on tenant's violation of city ordinances, the court would not permit the tenant's violation to be "twisted into a device to accomplish a purpose motivated solely by Landlord's self interest, or to cloak with propriety" the attempted forfeiture, *id*, 239 N.Y.S.2d at 321. And in *Cleveland v. Selwyn,* [292 Pa. 427, 430-431, 141 A.2d 155, 156 (1928),] the court found that surrounding circumstances demonstrated that the real purpose of the lessor in maintaining that his tenant had breached a lease covenant was to oust the tenant in order to get a better price for the property, and that such information was relevant in determining that forfeiture should not be enforced. 292 Pa. at 433, 141 A. at 157.

498 A.2d at 1160-61.

¶27. Here, the Bennetts no doubt feel that they are entitled to more rent than was originally bargained for. The long delay between this alleged breach and the Bennetts' attempt to terminate the lease show that the Bennetts are using the alleged violations as a pretext to get more money for their property. This issue is without merit.

## CONCLUSION

¶28. For the reasons set forth above, Waffle House did not violate the provisions of the lease agreement by adding more seats to the restaurant. The lease is unenforceable with respect to the other two violations alleged by the Bennetts, as the first has been waived and the second is merely a pretext. The judgment of the chancery court is, therefore, affirmed.

¶29. **MOTION FOR REHEARING DENIED. AFFIRMED**.

> **PRATHER, C.J., PITTMAN AND BANKS, P.JJ., SMITH, MILLS AND WALLER, JJ., CONCUR. COBB AND DIAZ, JJ., NOT PARTICIPATING.**