# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-00676-SCT

*CAMILLE VILLAGE, LLC*

*v.*

*FEDERAL NATIONAL MORTGAGE*
*ASSOCIATION AND BARINGS MULTIFAMILY*
*CAPITAL, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/27/2020 |
| TRIAL JUDGE: | HON. CARTER O. BISE |
| TRIAL COURT ATTORNEYS: | DAVID WAYNE BARIA |
| | JOHN G. CORLEW |
| | MICHAEL REID JONES |
| | SHERYL BEY |
| | ALAN LEE SMITH |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN G. CORLEW |
| | DAVID WAYNE BARIA |
| ATTORNEYS FOR APPELLEES: | ALAN LEE SMITH |
| | SHERYL BEY |
| | JUAN BENITO HERNANDEZ |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 01/20/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. This is a foreclosure dispute between Camille Village, LLC, the owner of an

apartment complex in Pass Christian, and the Federal National Mortgage Association and

Barings Multifamily Capital, LLC (collectively, "the Lenders"). The dispute began with the

failure of Camille Village to deposit additional money in escrow for repairs after it was demanded by the Lenders. The Lenders held Camille Village to be in default, lengthy settlement negotiations failed, and the amount demanded for repairs increased dramatically after additional inspections. After a trial, the chancery court concluded that Camille Village was in default and had failed to prove the Lenders had acted in bad faith. This appeal followed.

**FACTS**

¶2. Camille Village is an eighty-six-unit apartment complex located in Pass Christian, Mississippi. It is owned by North Street I, LLC, which is itself owned by Camille Village, LLC.[1] Camille Village mortgaged the property in 2009 to secure a $1,725,000 loan. The mortgage called for an eighteen-year repayment period and, notably, included a Replacement and Reserve Agreement, which required Camille Village to contribute to an escrow account for necessary repairs to the property. The loan was immediately assigned to Fannie Mae and was serviced during the relevant times by Barings Multifamily Capital, LLC.

¶3. The dispute began after a March 2017 inspection by the Lenders. The 2017 Property Condition Assessment ("2017 PCA") concluded that approximately $106,000 of repairs were needed. The balance of the replacement reserve in May 2017 was about $114,000, but most of that was earmarked for long-term replacements. Thus, the Lenders sent Camille Village a "demand for cure," which demanded deposits of approximately $106,000 into the

---

[1] The original party to the litigation was North Street I, LLC, but on appeal, Camille Village, LLC, was substituted. For convenience, we will refer to both Camille Village, LLC, and North Street I, LLC, as "Camille Village."

replacement reserve and the completion of the repairs outlined in the 2017 PCA. Camille Village began making repairs, but it balked at depositing the money in the replacement reserve, allegedly because it was concerned that the Lenders would not release escrow funds to pay it back for the repairs.

¶4. The Lenders regarded Camille Village's failure to deposit the demanded funds into the replacement reserve as a default and sent Camille Village a Notice of Default and Acceleration on August 22, 2017. At the same time, the Lenders initiated non-judicial foreclosure of the property and sought the appointment of a receiver in the United States District Court for the Southern District of Mississippi. Camille Village responded by seeking a temporary restraining order in the Chancery Court of Harrison County. The Lenders removed that cause to federal court, but due to ongoing settlement negotiations, all of the pending suits were voluntarily dismissed without prejudice.

¶5. The settlement negotiations ultimately failed. The Lenders commissioned a new inspection of the property in May 2018 that showed that the property required substantially more repairs than the prior inspection had—a total of $495,000. Subsequent inspections increased the estimate to $582,000 by November 2019.

¶6. Camille Village then filed the instant suit in the Harrison County Chancery Court, alleging (among other things) breach of contract and seeking an injunction against foreclosure. The Lenders counterclaimed for breach of contract, sought a declaratory judgment as to various facts entitling it to foreclose, and asked for the appointment of a receiver. The case went to trial, and after Camille Village presented its case, the chancellor

3

granted a Mississippi Rule of Civil Procedure 41 dismissal of all of Camille Village's claims except for breach of contract. Following the conclusion of the trial, the chancellor found no breach of contract on the part of the Lenders and entered a declaratory judgment permitting foreclosure. This appeal followed.

**DISCUSSION**

### 1.     Breach by Lenders

¶7.     Camille Village's first issue is a cursory argument about the interpretation of the contract. Camille Village points out that Section 2 of the Replacement and Reserve Agreement provided:

> Loans with Terms Over Ten Years. If the Loan term exceeds 10 years, then, no earlier than the 9th month of the year which commences on the 10th Anniversary of the date of this Agreement (and the 20th anniversary of the date of this Agreement if the Loan term exceeds 20 years), a physical needs assessment shall be performed on the Property by Lender at the expense of Borrower, which expense may be paid out of the Replacement Reserve. If determined necessary by Lender, after review of the physical needs assessment, Borrower's required Monthly Deposits to the Replacement Reserve set forth above shall be adjusted for the remaining Loan term so that the Monthly Deposits will create a Replacement Reserve that will in Lender's determination be sufficient to meet required Replacements (defined below).

¶8.     Camille Village argues that this provision, which required the lender to perform a physical needs assessment every ten years and permitted it to make adjustments to the replacement reserve "if determined necessary" following the physical needs assessment, is in conflict with other provisions of the agreement that allowed the Lenders to make adjustments to the replacement reserve at other times. According to Camille Village, "the

4

restriction controls," or, alternatively, this conflict created an ambiguity that should be resolved against the drafter (i.e., the Lenders).

¶9. The chancellor rejected this argument, finding:

> While Section 2 of the Reserve Agreement sets forth a mechanism which essentially requires Fannie Mae to evaluate and adjust the Replacement Reserve on the tenth anniversary of the loan if necessary, the loan documents do not preclude, and in fact, they allow, other opportunities to do the same at other times during the life of the loan.

¶10. In its reply brief, Camille Village also points to *Windmill Run Associates, Ltd. v. Federal National Mortgage Association (In re Windmill Run Associates, Ltd.)*, 566 B.R. 396, 409-10 (Bankr. S.D. Tex. 2017), in which the Bankruptcy Court for the Southern District of Texas found that a lender and servicer had acted in bad faith by demanding excessive funds be deposited in a reserve accounts for repairs. The bankruptcy court did look at a provision that was substantially identical to Section 2 of the Replacement Reserve Agreement, quoted above, and it quoted some other provisions of the agreement that appear to be identical to those in this case. *See id.* And it did conclude that the lenders lacked the authority to perform additional inspections and adjustments. *Id.* at 447.

¶11. Despite its factual similarities to today's case, *Windmill Run* appears to be founded on the particular arguments made in that case, i.e., that the unscheduled discretionary inspections authorized throughout the loan documents were actually themselves "physical needs assessments," which are supposed to be done every ten years on a schedule laid out in Section 2. *See id.* at 419. That argument has not been made in this case. Instead, as the

Lenders point out in their brief on appeal, Section 10 of the Replacement and Reserve Agreement provides:

> **Balance in the Replacement Reserve.** The insufficiency of any balance in the Replacement Reserve shall not abrogate the Borrower's agreement to fulfill all preservation and maintenance covenants in the Loan Documents. In the event that the balance of the Replacement Reserve is less than the *current estimated cost* to make the Replacements required by the Lender, Borrower shall deposit the shortage within 10 days of request by Lender.
>
> In the event Lender determines *from time to time based on Lender's inspections*, that the amount of the Monthly Deposit is insufficient to fund the cost of likely Replacements and related contingencies that may arise during the remaining term of the Loan, lender may require an increase in the amount of the Monthly Deposits upon 30 days prior written notice to Borrower.

(Emphasis added.)

¶12. Section 5.1(d) of the Replacement and Reserve Agreement states in relevant part:

> If *at any time during the term of the Loan*, Lender determines that replacements not listed on Exhibit A [of the reserve agreement] are advisable to keep the Property in good order and repair and in a good marketable condition, or to prevent deterioration of the Property . . . Lender may send Borrower written notice of the need for making Additional Replacements.

(Emphasis added.)

¶13. And Section 7(a)(4) of the Deed of Trust, which states in relevant part:

> Borrower shall deposit with Lender . . . an additional amount sufficient to accumulate with Lender the entire sum required to pay, when due . . . . amounts for other charges and expenses which Lender *at any time reasonably deems necessary to protect the Mortgaged Property*, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, *all as reasonably estimated from time to time* by Lender.

(Emphasis added.)

¶14. And Section 13 of the Deed of Trust states:

6

**13. INSPECTION.**

Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

¶15. After reviewing the contract documents in their entirety, we agree with the chancellor that Section 2 of the Replacement and Reserve Agreement only specifies that a "physical needs assessment" and accompanying adjustment *must* be done every ten years; it does not limit the Lenders' authority to adjust the replacement reserve at other times based on other inspections as permitted elsewhere in the loan documents. We find no contradiction or ambiguity in the contract and thus no breach by the Lenders in adjusting the replacement reserve as permitted by the contract.

## 2. Duty of Good Faith and Fair Dealing

¶16. Camille Village next presents a series of complaints about the Lenders' conduct under the agreement, alleging a breach of the duty of good faith and fair dealing. The chancery court granted the Lenders' Rule 41 motion for involuntary dismissal on this claim, finding that Camille Village's contentions amounted to failed settlement negotiations and disagreements about the necessity and cost of repairs. The chancellor explained (from the bench):

With regard to the motion for an involuntarily dismissal, under Rule 41, I'm granting the motion to the extent of the claim of a violation of the duty of good faith and fair dealing. That entire argument hinges upon the assertion that a settlement agreement was reached, and there never was a settlement agreement. There was never a meeting of the minds. And because that falls, then so does the argument that has been a bad faith breach of contract by the

defendants, and because that falls, I find that there is no claim for equitable estoppel, an independent master, an injunction, or punitive damages.

¶17. After a careful review of the record, we agree with Camille Village that the chancellor's recitation of its case for a violation of the duty of good faith and fair dealing was incomplete. Specifically, Camille Village's attorney argued:

> They sought a receivership, which as the court is aware is a remedy and not a stand-alone legal action. They inflated estimates for the work that they believe needed to be done through their property condition assessments without any connection to reality in terms of costs of materials and costs of labor and what it actually costs to do the work in this area. They refused to communicate with our man on the ground, Mr. Smith, about those issues, and they refused to communicate with Mr. Corlew with regard to the reports of the work that he was regularly submitting to Fannie Mae['s] counsel.

¶18. Camille Village did argue the other things it now asserts on appeal in the trial court. Nonetheless, the chancellor subsequently made findings of fact concerning the important points, and the complaints that the chancellor did not acknowledge are not substantial enough to call the chancellor's decision into question. When reviewing a Rule 41(b) involuntary dismissal, "we do not consider the evidence de novo, but rather we apply the same substantial evidence/manifest error standards as are generally applicable when we are reviewing the findings of trial judges." ***Davis v. Clement***, 468 So. 2d 58, 62 (Miss. 1985).

¶19. Camille Village breaks down its case as follows:

> A. *"Fannie Mae and its Agents Stonewalled All Communications with North Street."*

¶20. Under this first point, Camille Village claims that the Lenders stonewalled communications with it. This subissue centers around the early requests for repairs in June to August 2017. After receiving the demand, Camille Village secured counsel, and Camille

8

Village's counsel sent a letter to the loan servicer—which Camille Village then faults for securing counsel itself. Camille Village claims certain requests for clarification were not answered. These included questions regarding how the Lenders would determine whether the demanded work was "good and workmanlike" as required by the Replacement Reserve Agreement and "whether approval of contracts for work would be required as referenced by the Reserve Agreement." The end result of this was allegedly a "lack of any understanding of how repairs could be approved and/or contracts awarded." Essentially, it appears that Camille Village wanted assurances that its repair efforts would be deemed adequate and that it would be repaid from the repair reserve. The managing member for Camille Village testified:

> The problem I had . . . is that if I gave you all the money, I didn't know how I was going to get it back. And we wanted to make sure that we were on the same page with you guys as far as the work that had to be done. And I felt that you all stonewalled us, and we had no—there was no meeting of the minds. I'm happy to put up the money if I know I do the work and I can get it back. I have no problem with that. We never could get that far with you all.

¶21. It is apparent from the record that most of Camille Village's communications issues stemmed from the fact that the Replacement Reserve Agreement required it to deposit the funds for the repairs first, make the repairs with its own, additional money, then ask for the deposited funds back. But that is what Camille Village agreed to when it executed the Replacement Reserve Agreement. And, as the Lenders point out in their brief, the Lenders were not obligated under the mortgage documents to answer prospective or hypothetical questions presented by Camille Village's counsel after the demand for cure was issued. Instead, the contract laid out the process for reimbursement, and it expressly required the

9

borrower to make the repairs before requesting reimbursement. Section 4(c) of the Replacement Reserve Agreement provided: "Each request for disbursement from the Replacement Reserve shall be made only after completion of the Replacement for which disbursement is requested. Borrower shall provide Lender evidence satisfactory to Lender in its reasonable judgment, of completion."

¶22. Camille Village also suggests that the Lenders frustrated their repair attempts by failing to approve or disapprove contractors under the Replacement Reserve Agreement, but Camille Village fails to cite any specific instances in which a contract was submitted and the Lenders failed to respond or wrongfully refused to approve of the proposed work.

¶23. Camille Village has failed to show any stonewalling that prevented its performance under the contract or any other breach of the duty of good faith and fair dealing with these arguments.

      B.     *"Fannie Mae and Its Agents Orchestrated a Campaign to Rachet Up Pressure on North Street*."

¶24. Next, Camille Village contends the Lenders exaggerated the cost of repairs after settlement negotiations broke down.

¶25. Camille Village points out that the 2017 estimate for repairs that initiated this dispute was for approximately $106,000. The 2018 estimate increased dramatically to $495,000, and then to $566,000 in May 2019 and $582,500 in November 2019.

¶26. This issue essentially boils down to a battle of experts. The Lenders' expert, Jeff Roden of F3, Inc., testified that the repairs were necessary and that the estimated costs were accurate. Camille Village admits as much in its brief; it simply contends that its expert was

10

more credible, and it recites a lengthy list of reasons for preferring its expert and his estimates. Camille Village's expert "disagree[d] with every line item as a total cost."

¶27. The chancellor recognized this dispute for what it was, and he found the Lenders' expert more credible:

> [Camille Village] also argues that Fannie Mae and Barings breached the contract by arbitrarily escalating the cost estimates between the original 2017 PCA and the most recent one in 2019. However, the Court is inclined to note that in their Proposed Findings of Facts and Conclusions of Law, [Camille Village] failed to cite a provision from the Loan Documents which would show that the escalating cost estimates were in breach of the parties' contract, and the Court has already dismissed the argument that Fannie Mae breached the implied warranty of good faith and fair dealing. The Court does find that the cost estimates drastically increased, but the evidence presented did not support the claim that it was arbitrary.
>
> Jim Smith, a contractor with 26 years of experience, testified on behalf of North Street. Mr. Smith was engaged by [Camille Village] to address repairs outlined in the 2017 PCA. Mr. Smith testified that he was present in 2018 and 2019 when the subsequent inspections that resulted in PCAs were completed. Mr. Smith testified that he disagreed with the cost estimates set forth in the 2018 and 2019 PCAs, and he felt that the actual costs to do the work would be significantly less. On cross examination, Mr. Smith conceded that he was unfamiliar the methodology employed in preparing a Property Condition Assessment. Jeff Roden of F3 Construction testified on behalf of Fannie Mae and Barings. Mr. Roden completed the 2018 and 2019 PCAs on behalf of F3. Meg McGuire did the first PCA in 2017, also on behalf of F3. Mr. Roden testified that Ms. McGuire only visited one "down unit" (a unit that is not inhabitable) as part of her inspection. Mr. Roden, in 2018, inspected 11 down units and concluded that the foundation rating was a four. He testified that he did not know how Ms. McGuire made her conclusions regarding the foundation rating of 2, but he testified from her report that the crawl space was [inaccessible]. Mr. Roden conceded that he is not familiar with local labor or material costs, but he stated that the units were moving in the wrong direction throughout his three evaluations, and it was his professional opinion that if Camille Village were completely renovated, it could receive a 2 rating due to age. Mr. Roden agreed that the ratings are subjective, and the Court would note that this is supported by the fact that Ms. McGuire assessed the property

11

as a 2 in 2017 and Mr. Roden concluded there were much more significant issues, giving it a 4 in 2018.

The Court cannot conclude, based on the evidence, that Fannie Mae arbitrarily increased the repair costs, although it is troubling that the estimates were so inconsistent from 2017 to 2018 and 2019. Regardless, [Camille Village] has failed to cite any provision of the Loan Documents that have been breached. [Camille Village] discusses at length in its Proposed Findings of Facts and Conclusions of Law the credentials and methodology of Jeff Roden versus those of Jim Smith. However, without a contractual leg to stand on, these arguments do nothing to advance their claim as it relates to the breach of contract claim. North Street also utilized Mississippi Home Corporation reports to further their position that the F3 reports were inflated, but the Court rejects that argument as HUD standards and Fannie Mae's interest in protecting the economic value of Camille Village are not analogous. Additionally, the Court notes that even if the estimates/demands made by Fannie Mae and Barings were excessive or arbitrary, had North Street deposited the funds and completed the repairs, the funds would have reverted back to [Camille Village].

¶28. While it is true that the chancellor did not directly take this issue as being presented in the context of a failure of good faith and fair dealing, the chancellor's findings are sufficient to dispose of the issue regardless; the chancellor found that he "[could not] conclude, based on the evidence, that Fannie Mae arbitrarily increased the repair costs."

¶29. We cannot find a basis in the record to disturb the chancellor's findings on this point.

C.    *"The Lawsuit/Foreclosure Tactic"*

¶30. Camille Village contends the Lenders engaged in "litigation pressure tactics":

First, Fannie Mae initiates a court proceeding and before discovery or any substantial progress of same, institutes a separate state law foreclosure proceeding. This forces a borrower to engage in litigation in the Court in the receivership proceeding and to separately file an injunction to stop the foreclosure. Here, Fannie Mae filed in federal court to appoint a receiver. With no discovery or case management conference in that action, Fannie Mae started a separate state law foreclosure action, forcing North Street to file an injunction action to stop the foreclosure. Fannie Mae removed this action to

12

federal court forcing [Camille Village] to seek emergency relief to halt the foreclosure. The Court issued an order to Fannie Mae to brief whether there were federal court jurisdiction. Both federal suits were then dismissed.

(Footnotes omitted) (citations omitted.) As Camille Village's brief notes, however, the voluntary dismissal of these suits was followed by settlement negotiations that eventually failed.

¶31. Camille Village fails to show that any litigation was unwarranted or somehow breached the Lenders' duty of good faith and fair dealing.

>    D.    *"The Lower Court Erroneously Tied the Entirety of the Breach of Good Faith and Fair Dealing on the Failed Settlement."*
>
>    E.    *"Any Factual Determination by the Lower Court Inherent in Good Faith and Fair Dealing is Not Supported by Substantial Evidence."*

¶32. Finally, Camille Village contends that the chancellor oversimplified its argument regarding this issue when he summarized it before granting the Rule 41(b) motion for involuntarily dismissal. That might be true. But the chancellor eventually made findings sufficient to dispose of all of Camille Village's contentions regarding this issue. As noted above, those findings of fact are supported by substantial evidence. Thus, no error has been shown on this point.

>    F.    *Conclusion*

¶33. We affirm the chancery court's finding that Camille Village failed to show a breach of the duty of good faith and fair dealing.

>    **3.    "Fannie Mae Deliberately Placed Obstacles to Contract Performance."**

13

¶34. Camille Village's third issue is an attempt to reframe the contentions in the preceding issues: "Where a contract is performable on the occurrence of a future event, there is an implied agreement that neither party will place any obstacle in the way of the happening of such event, and where a party is himself the cause of the failure he cannot rely on such condition to defeat his liability." *Garner v. Hickman*, 733 So. 2d 191, 195 (Miss. 1999) (internal quotation marks omitted) (quoting *Warwick v. Matheney*, 603 So. 2d 330, 336 (Miss. 1992), *overruled on other grounds by Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224 (Miss. 2012)).

¶35. We have already addressed and rejected the same contentions made under the umbrella of a breach of the duty of good faith and fair dealing. No new factual argument has been presented. We find no merit to this issue.

### 4. Forfeiture

¶36. Finally, Camille Village briefly argues that the result should be overturned because it is an inequitable forfeiture. Camille Village points out that it never missed a monthy interest/principal payment and that it had paid a substantial sum over ten years. It contends that the result of a foreclosure would be a windfall to the Lenders.

¶37. It is true that "equity abhors a forfeiture." *Maxey v. Glindmeyer*, 379 So. 2d 297, 301 (Miss. 1980) (citing *New Orleans Great N. R.R. Co. v. Belhaven Heights Co.*, 122 Miss. 190, 84 So. 178 (1920)). But this Court has elaborated:

> The maxim, equity abhors a forfeiture, is recognized by Mississippi jurisprudence. *Citizens' Bank of Hattiesburg v. Grigsby*, 170 Miss. 655, 666, 155 So. 684 (1934). It is wise to avoid forfeitures. And this doctrine may be applicable even where a contract mandated forfeiture. *Fullerton Greenview*

14

> *Amusement Corp. v. Hollywood Bldg. Corp.*, 305 Ill. App. 452, 27 N.E.2d 641 (1940). However, this doctrine generally applies in those situations where the alternative to forfeiture is an equitable remedy to the complaining party, i.e., the return to the position he would have been in had the breach not occurred. *Paeff v. Hawkins-Washington Realty Co.*, 320 Mass. 144, 148 67 N.E.2d 900, 166 A.L.R. 804 (1946). Where the damages cannot be calculated with reasonable precision, relief against forfeiture will not normally be given. POMEROY'S EQUITY JURISPRUDENCE, Vol. 1, § 450, at p. 855 (4th Ed. 1918).
>
> Where there is legal authority, whether primary authority or private/contractual authority, which calls for forfeiture, and there is no equitable alternative to forfeiture, forfeiture will be granted.

*Columbus Hotel Co. v. Pierce*, 629 So. 2d 605, 609-10 (Miss. 1993).

¶38. This is a commercial transaction, and both parties are sophisticated. Camille Village is an LLC, and there is apparently nothing protecting the loan other than resort to the property itself. And while Camille Village points to how much it has paid over the course of the loan, $1,565,000 of the original $1,725,000 principal remained unpaid at the time of trial. The Lenders had a very real interest in the property to protect.

¶39. Moreover, there does not appear to be any remedy available other than foreclosure. As noted in *Columbus Hotel Co.*, when the contract "calls for forfeiture, and there is no equitable alternative to forfeiture, forfeiture will be granted." *Columbus Hotel Co.*, 629 So. 2d at 610. Camille Village is unable or unwilling to perform the contractually required maintenance on the property. It cannot point to any equitable alternative to foreclosure; it only argues that the repairs demanded were unnecessary, which the chancellor found not to be the case. Thus, we can find no basis to say the chancery court abused its discretion by denying an equitable remedy to foreclosure.

## CONCLUSION

¶40.   Camille Village has failed to show any error in the court below.  We therefore affirm the chancery court's judgment.

¶41.   **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR.  KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶42.   Because I would find that the trial court erred by dismissing Camille Village LLC's claim of the breach of the duty of good faith and fair dealing against the Federal National Mortgage Association (Fannie Mae), I respectfully dissent. The trial court determined that Camille Village's arguments relating to the breach of the duty of good faith and fair dealing hinged on the assertion that the parties had reached a settlement agreement. However, I would find that Camille Village presented sufficient evidence showing that Fannie Mae demanded exorbitant amounts of money from Camille Village in short periods of time, failed to effectively communicate with Camille Village, and pursued litigation rather than the resolution of the dispute.

¶43.   This Court previously has held that the duty of good faith and fair dealing applies to mortgage contracts. *Merchs. & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 405 (Miss. 1997). It is clear that "[t]he mortgagee is . . . not permitted to act in whatever manner it deems to be in its best interests." *Id.* at 404. "[T]he mortgagor and mortgagee are in a relationship of trust, and the mortgagee should not be allowed to abuse that relationship . . . ." *First Am. Nat'l Bank of Iuka v. Mitchell*, 359 So. 2d 1376, 1380 (Miss. 1978) (citing

16

*Fed. Land Bank v. Collom*, 201 Miss. 266, 28 So. 2d 126 (1946)), *overruled on other grounds by C & C Trucking Co. v. Smith*, 612 So. 2d 1092 (Miss. 1992).

¶44. In 2009, Camille Village and Fannie Mae entered into a loan contract for an eighty-six unit multifamily complex in the amount of $1,725,000. Camille Village faithfully made monthly payments of principal and interest under the loan. In March 2017, Fannie Mae directed an inspector to conducted a property condition assessment of Camille Village. The 2017 property report stated that

> management appears to be adequately addressing the upkeep of the Property. . . . Overall the Property is in acceptable condition, and is equivalent when compared to properties of similar age and construction type. It is our opinion that the estimated useful life of the Property, in its current use, is at least an additional 30 years, if the repairs described in the report are made, the physical improvements receive continuing maintenance and if the various components and/or systems are replaced or repaired on a timely basis as needed.

The property assessment report listed repairs needed in the amount of $105,798.

¶45. To address the items labeled as safety hazards, Fannie Mae demanded that Camille Village deposit $21,800 into the replacement reserve account within ten days. Camille Village was directed to deposit an additional $83,998 within thirty days to address the remaining repairs. Further, Fannie Mae demanded that Camille Village fully repair the items listed in the property assessment report. Thus, Fannie Mae demanded that Camille Village incur $105,798 in repair expense *and* deposit the same amount of money into the replacement reserve account within thirty days. Fannie Mae also demanded that Camille Village increase its monthly reserve payments by $1,950 pursuant to the Replacement Reserve and Security

17

Agreement. The demand increased the monthly deposit to the replacement reserve account from $2,150 to $4,100. The replacement reserve account is in the control of Fannie Mae.

¶46.    At that time, the balance of the replacement reserve account was approximately $120,000. However, Fannie Mae stated that the money already in the reserve account had been dedicated to future replacement costs. On June 22, 2017, counsel for Camille Village wrote a letter to Barings Multifamily Capital, the loan servicer for Fannie Mae, and proposed the following questions and concerns:

> a. The Assignment reads to "Fannie Mae" without further identification or any address or other contact information. Mr. Lloyd's letter copies "Fannie Mae" with no further identifying information. Who is Fannie Mae? Where may we contact some person with this organization to discuss the deed of trust of which is it an assignee?
>
> b. What authority does Barings Multifamily Capital, LLC have to act on behalf of Fannie Mae? Mr. Seago does not have a copy of any contract designation or other document that authorizes you to act on its behalf as a "loan servicer" under the terms of the Deed of Trust.
>
> c. Do you have a copy of the Replacement Reserve and Security Agreement dated July 23, 2009 which is referenced in Mr. Lloyd's May 25, 2017 letter? If so, I would appreciate receiving a copy as soon as possible. Mr. Seago has specifically requested Alliant Capital for copies of any documents related to the Camille Village project. He has been advised that the only transaction document is the North Street I, LLC Operating Agreement.
>
> I do not know if Mr. Seago has some dispute with you involving reserve accounts. I do know that the Operating Agreement provides for operating deficit reserve account, replacement reserve and rental subsidy reserve. I also know that since at least May 2016 Mr. Seago has sought to withdraw funds from reserve accounts for reimbursement of expenses and necessary repairs at Camille Village. Despite repeated assurances from Alliant's Mr. Mistry, the Alliant entities have stonewalled released of reserve funds for any purpose. These issues may be of no concern to you but I am seriously concerned about

exacerbating the reserve account problem Mr. Seago already has with Alliant when I have never seen the Replacement Reserve and Security Agreement dated July 23, 2009 to which the May 25, 2017 letter refers and the existence of which Alliant has effectively denied.

¶47. Counsel for Camille Village testified that he did not receive a response. Michael Seago, the sole managing member of Camille Village, testified that Camille Village did not deposit the additional $105,798 into the reserve account. However, he testified that Camille Village did increase its monthly reserve account deposits by $1,950 and that he commenced the repairs listed in the property assessment report. Seago testified that he was unsure how he would get the money back if he deposited the same into the replacement reserve. He stated that he had attempted to resolve this litigation with Fannie Mae, yet he had been

> [p]retty much stonewalled. I mean, they—they wouldn't budge. I wanted to know if I put the money up, how would I get the money back. I didn't have a direction from them on what they wanted done. . . . I just felt after dealing with them and fighting over the escrow money, why am I going to give them more money when they're not telling me, one, how I'll get it back, and, two, direction that they're going to approve the work that I've done.

Seago stated that he had previously had trouble getting money back from the replacement reserve account and that he wanted to make sure if he made the repairs listed in the report that he would be refunded. Seago testified that he did not receive answers to address his concerns.

¶48. On August 22, 2017, Fannie Mae issued a Notice of Default and Acceleration & Revocation of Right to Collect Rents. The notice demanded "immediate payment in full of the entire unpaid principal balance of the Note, plus (to the extent lawful) accrued and unpaid interest thereon and the costs and attorneys' fees of Fannie Mae." Fannie Mae additionally

19

terminated Camille Village's right to collect rents. Further, Fannie Mae "swept" the escrow funds in the replacement reserve account. Counsel for Camille Village testified that, after that point,

> any reserve for taxes or escrow for taxes, any escrow for insurance, any money in the reserve account was all passed over to Fannie Mae, including principal and interest payments. And Fannie Mae had declared at that time North Street to be in default. They never credited another payment to principal. They acted as if we had no escrows or reserves. They began to show on their records that we owed late charges on the principal and interest and that we were accruing default interest through some other provision of their loan documents.

¶49. Fannie Mae next filed a federal court action and sought the appointment of a receiver for the property. In February 2018, Fannie Mae filed a state court foreclosure proceeding with a foreclosure sale date of March 2, 2018. This forced North Street to file an injunction action to stop the foreclosure. Fannie Mae then removed the action to federal court. The parties attempted to engage in settlement negotiations and agreed to dismiss all pending litigation without prejudice and to abandon the scheduled foreclosure sale.

¶50. Camille Village began addressing the issues in the 2017 property assessment report. Counsel for Camille Village forwarded an email to counsel for Fannie Mae with pictures of the progress of the repairs being made. These repairs included: replacing the damaged subfloors in three units; replacing all damaged decking planks in the stairway and landing of Building 37 and missing balustrade rails in Buildings 37 and 38; completing the fire extinguisher repairs; adding roof level gutters to Buildings 37 and 38; restriping all parking stalls; repairing the damaged concrete on all walkways; adding handrails where needed; replacing the shingles on Building 39 to match the remaining roof; replacing all broken

20

windows in units 412 and 424; and replacing the exterior door and frame to the maintenance shop.

¶51. Fannie Mae again inspected the property in November 2017. Counsel for Camille Village testified that he did not receive any feedback about the November inspection and stated that the representatives for Fannie Mae would not speak with Camille Village's construction consultant on-site. Fannie Mae presented a settlement proposal; however, the proposal granted a full and complete release to Fannie Mae and Barings for any and all claims prior to the execution of the document and with no release in favor of Camille Village.

¶52. In May 2018, Fannie Mae directed a second property assessment. The second property assessment drastically increased the cost of repairs. The summary of recommended repairs and replacement cost estimates in the 2018 property assessment listed the following as needed repairs: $22,500 in life safety items, $328,500 in critical items, and $144,000 in deferred maintenance for a total of $495,000.

¶53. Fannie Mae additionally sent an amended notice of default that demanded that Camille Village deposit $368,848.80 into the replacement reserve no later than thirty days from the date of that correspondence. Camille Village filed a declaratory judgment action in the Chancery Court of Harrison County at that time. In May 2019, a property condition assessment escalated the price of repairs to $566,000. In November 2019, another property condition assessment listed the projected cost of repairs at $582,500.

¶54.     "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." ***Am. Bankers' Ins. Co. of Fla. v. Wells***, 819 So. 2d 1196, 1206 (Miss. 2001) (internal quotation marks omitted) (quoting ***Motors Acceptance Corp. v. Baymon***, 732 So. 2d 262, 269 (Miss. 1999)). Fannie Mae previously has been found to have engaged in efforts to force a foreclosure, as detailed below:

> [A]lthough the Debtor was never in default on payments of principal and interest under the loan, Oak Grove and Fannie Mae worked together in bad faith to drive toward a foreclosure of Debtor's interest in the property. This drive was not motivated solely by a desire to ensure that the property was well-maintained. Rather, Fannie Mae and Oak Grove perceived an opportunity to remove the property from the restrictions of the [Low Income Housing Tax Credits], and to trigger recourse liability for the Debtor's principals, by foreclosing. This would increase the value of the property by enabling the new owner of the property to charge market rents. Oak Grove previously has foreclosed on Fannie Mae properties in Kentucky and Oklahoma, both of which were current on principal and interest, but as to which some problem other than staying current on principal and interest was perceived by Oak Grove to justify foreclosure. . . . After the filing of the bankruptcy case, Fannie Mae and Oak Grove focused on litigation rather than negotiation . . . .

***Windmill Run Assocs., Ltd. v. Fed. Nat'l Mortg. Ass'n***, (***In re Windmill Run Assoc., Ltd.***), 566 B.R. 396, 402-03 (Bankr. S.D. Tex. 2017). I would find that the instant case is similar. In 2017, without prior notice, Fannie Mae demanded that Camille Village deposit approximately $105,000 into the replacement reserve account within thirty days, in addition to making the repairs listed in the property condition assessment. Although it essentially demanded over $200,000 in thirty days, Fannie Mae then failed to effectively communicate with Camille Village regarding the replacement reserve account and the process Fannie Mae used to determine whether the repairs were acceptable.

22

¶55.    Although Camille Village remained current on principal and interest, less than six months later, Fannie Mae sent a notice of default that demanded immediate payment in full of the entire principal balance of the note, plus any accrued interest and attorneys' fees. Further, the 2017 report stated that "management appears to be adequately addressing the upkeep of the Property. . . . Overall the Property is in acceptable condition, and is equivalent when compared to properties of similar age and construction type." Yet Fannie Mae directed a second property assessment in 2018 that increased the needed repairs by 468 percent. In 2017, the property condition assessment rated the foundation condition and building materials as a two on a scale of five, the second best category. Yet in 2018, the foundation condition and building materials were rated a four, the next-to-worst rating.

¶56.    Although Camille Village had faithfully made monthly payments since the beginning of the loan, Fannie Mae additionally, and without notice, swept all payments made by Camille Village after May 25, 2017. It filed a federal court action to appoint a receiver to collect all rents at Camille Village. Fannie Mae then initiated a state law foreclosure proceeding. While Fannie Mae participated in settlement negotiations, it proposed a forbearance agreement that would have released Fannie Mae and Barings for any and all prior claims and did not include a release for Camille Village. The result of Fannie Mae's actions caused a forfeiture of approximately ten years of monthly payments of principal, interest, escrows for taxes, insurance, and replacement reserve. In addition, it allowed Fannie Mae to foreclose on an eighty-six-unit apartment complex on nineteen acres of land.

¶57. Taking all of the evidence into consideration, I would find that Fannie Mae's conduct breached its duty of good faith and fair dealing. Therefore, I would find that the trial court abused its discretion by dismissing Camille Village's claim against Fannie Mae.

**KITCHENS, P.J., JOINS THIS OPINION.**