629 So.2d 605 (1993)
COLUMBUS HOTEL COMPANY, a Delaware Corporation,
v.
Elmer PIERCE, Jr., Charles N. White, d/b/a El Ark, Inc., an Arkansas Corporation, Kenneth L. Smotherman and Edwin C. Mauck, and all others holding by, through and under them; First Federal Bank for Savings; and City of Columbus, Mississippi.
No. 90-CA-0846.
Supreme Court of Mississippi.
December 23, 1993.
*606 J. Randolph Lipscomb, Lipscomb Geeslin & McClanahan, Columbus, for appellant.
David L. Sanders, Mitchell McNutt Threadgill & Sams, Douglas Dalrymple, Columbus, for appellees.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
SULLIVAN, Justice, for the Court:
Columbus Hotel Company (hereinafter, CHC) filed suit in 1988 against the lessee, El-Ark, Inc., and its sublessees/assignees to cancel a long term lease agreement. CHC alleged in its complaint that the lease had been breached by failure to render annual audits, numerous late payments and checks returned for insufficient funds, for tearing down a bus station on the property, and for entering into a deed of trust with First Federal Bank without the consent or knowledge of CHC.
CHC leased a motel facility to El-Ark, Inc. The lease and management of this motel has been assigned to various persons. Under the lease agreement El-Ark's duties as lessee remained unaffected by assignments or subleases. Certain lessees are not closely associated with El-Ark, Inc., except through assignment. To avoid confusion, the lessees and assignees/sublessees shall hereinafter be collectively referred to as El-Ark.
This 1979 agreement provided that the rent was $1500 per month, plus a percentage of profits from room rentals and other income such as that derived from the sale of food and beverages. This payment was due 75 days after the close of each accounting year, and was to be accompanied by a certified public accountant's audit of such profits.
Section IX of the agreement is pertinent to one issue. This section deals with failure to pay the rent as well as other types of breaches. It states that if El-Ark fails to comply with a provision other than payment of rent, then CHC can give notice in writing of the default; and if it is not cured by El-Ark within 30 days from the notice, CHC can elect to terminate the lease. If the default is such that it can not be reasonably cured within 30 days, then an extension could be given. This extension is limited to time necessary to cure through due diligence, but the period for cure cannot exceed 60 days after notice.
The lease provides that CHC's remedy for El-Ark's failure to cure such a default is forfeiture. Assuming that a default and failure to cure within the time provided for has occurred, the lease allows CHC to declare the lease forfeited, "and then all of LESSEE's rights of possession shall thereupon entirely cease...." (Ex. P-1, Lease Agreement).
During the early years of this lease, the tenants did not tender records along with the yearly percentage of revenues. Later, CHC began to ask for records along with the payment to confirm that it was receiving its due share of the profits. The tenants tried to comply with CHC's request by supplying notes of figures representing expenses and profits from the various areas of the motel business. By 1987, CHC had received a number of bad checks and demanded that they be cured and that El-Ark provide an audit in compliance with the lease.
A number of accounting firms have been hired to audit the motel's business, but the accountants were unsuccessful. The accountants gave reports, but qualified their results by stating that the accounting and recordkeeping procedures employed by El-Ark were an inadequate basis for an audit. One expert witness of the accounting field testified that he could not give an opinion of what the annual profits were based on his review of the records. It is possible that what El-Ark actually profited was a greater amount than that which it reported to CHC. One accounting firm stated that it "attempted" to complete an audit, but that its report could not meet the standard of general audits. This firm suggested accounting procedures which could be used in the future to adequately substantiate an audit.
The chancellor found that CHC had waived its entitlement to a CPA's audit for the initial years of the lease through 1986. However, the chancellor found that that waiver ended for the 1987 year, and El-Ark had a duty to provide an audit to CHC. The chancellor *607 further concluded that El-Ark had not provided an adequate audit to comply with the lease for 1987, and thus was in default. However, the chancellor did not grant a forfeiture, reasoning that forfeiture would yield an unconscionable windfall to CHC. The chancellor concluded that it would be sufficient for El-Ark to begin to use the accountant's suggested procedures needed to provide proper audits in the future.
The agreement also covered the disposition of improvements at the termination of the lease. It stated that if the lease were terminated because of breach by the lessee of any covenant in the lease, then all improvements of any kind were to be retained and fully owned by the lessor, CHC.
The market value of the fee simple interest in the motel property was $1,150,000, as determined by an appraisal; this value included some major improvements in the nature of remodeling made by El-Ark, et al., around 1986. The current tenant owed $1,000,000 on a deed of trust covering the leased premises, financed by First Federal. Though previous deeds of trust were consented to by CHC, this one was created without CHC's knowledge. Later, CHC found out about it, and as one item of correspondence put it, "the cat was out of the bag." Apparently, this figure was significant to the chancellor, since he found that forfeiture of the lease would yield an unconscionable windfall of $1,000,000 to CHC.
The lease also gave El-Ark an option to purchase a specific portion of the leased premises. The city had condemned the bus station located on this lot because it was unsafe and open to the public. CHC renewed this option as El-Ark represented that it would purchase the lot. El-Ark demolished the bus station which was on that lot, but did not purchase it.
One of CHC's complaints in this lawsuit is that El-Ark, Inc.'s officers misrepresented that it was an Arkansas corporation. CHC had requested information on El-Ark from the Arkansas Secretary of State, who responded that such a corporation was not listed in the state's records of Arkansas corporations. Later, however, the Arkansas Secretary of State determined that El-Ark was in fact an Arkansas corporation. It did not find it in its previous search because of a mistake in the name of the corporation: it did not have an "El-Ark, Inc.," in its records, but did have "El-Ark Corporation," which is the primary lessee in the instant case. El-Ark Corporation is chartered under the laws of Arkansas. The chancellor concluded that El-Ark Corporation had been mistakenly listed as El-Ark, Inc., in the lease, but was the business entity which dealt with CHC.[1]

I. FORFEITURE[2]
The chancellor concluded that what the tenants tendered to CHC for 1987 was not an *608 audit as required by the lease; the Chancellor further determined that having the proper audit was an important part of the agreement, as CHC was entitled to a percentage of the yearly profits. Because El-Ark, et al., have not shown why the chancellor was manifestly wrong in determining that a breach did occur and the proper audits were not provided after 1986, we affirm this finding.
Because no reliable audits have been provided for any of the years, CHC will never know what it was entitled to during those years. While the chancellor found that CHC had waived its right to an audit through 1986, the tenants were directly put on notice that CHC required full compliance with those provisions of the lease, and the chancellor concluded that the tenants had breached the audit requirement for the 1987 revenues.
In the instant case, neither party has alleged a flaw in the formation or the validity of the lease agreement. If the lease agreement was not an unconscionable contract, then it must be enforced according to its terms, subject to principles of equity.
We hold that the chancellor erred as a matter of law in finding that the result of the forfeiture was unconscionable. The chancellor reasoned that for CHC to receive the leased property, it would receive a windfall worth $1,000,000. The chancellor said that this would be a disproportionate loss to El-Ark.
However, El-Ark will no longer be paying CHC the monthly rent. Also, CHC will no longer be entitled to the additional rent based on a percent of their yearly profits, which, incidentally, have not been diligently paid or reported by El-Ark. The circumstances surrounding the course of dealing of these parties, especially the tenants' continued failure to keep adequate records for an audit, also support the lack of an unconscionable result. The record indicates that the tenants were fully aware of CHC's desire to receive proper audits and its power to terminate the lease. Furthermore, the lease stated that upon proper termination of the lease, improvements made by the tenant would become property of the lessor, CHC. There has been no challenge to the formation of the contract based on an unconscionable bargain theory. At one point, a tenant made a deed of trust on the property without CHC's knowledge or consent. The ostensible nature of this transaction is evidenced by one item of correspondence which acknowledged that "the cat was out of the bag," when CHC learned of this deed of trust. All of these circumstances are relevant to whether the result of forfeiture would be unconscionable.
The tenants would have made a better case for an unconscionable result had they been diligent in their attempts to begin proper accounting procedures. This Court recognizes that the tenants will lose a business venture as a result of forfeiture, and also that they have invested large sums for the improvements to the property. However, in view of all the circumstances, the result is not wholly one-sided or oppressive; it does not shock the conscience.
The degree of oppression required to preclude forfeiture is exemplified in the following quote from Koch v. H. & S. Development Co., 249 Miss. 590, 630, 163 So.2d 710 (1964).
A court of equity ... should afford relief where obviously there is fraud, real hardship, oppression, mistake, unconscionable results, and the other grounds of righteousness, justice and morality.
Koch, 249 Miss. at 630, 163 So.2d 710.
The result of forfeiture here is not unconscionable, but is potentially harsh. Even though the result may be harsh, the result will be enforced when mandated by a legally valid contract. The Koch court stated,
The written words of a contract afford greater certainty of intention, and more accurate compliance with and performance of the terms of the contracts by the parties thereto than do the retrospective, impassive conclusions of a court of equity. A *609 court of equity should not be the first, but the last resort. It is bound by a contract as the parties have made it and has no authority to substitute for it another and different agreement... .
Koch, 249 Miss. at 630, 163 So.2d 710. The Kentucky Court of Appeals recognized that a forfeiture clause in a contract will be enforced even though it may be harsh. Blue Ridge Coal Co. v. Hurst, 196 Ky. 432, 244 S.W. 892, 893 (1922). That court also stated that a court "cannot make for the parties a different contract than they have made for themselves." Id.
No true audit has ever been provided to CHC, and the time period to cure a default after notice has passed. Therefore, according to the lease, it is forefeited. The chancellor found that El-Ark was in default for the 1987 audits, and that the audits were an important part of the contract since CHC was entitled to a share of the profits. The chancellor found that El-Ark's failure to provide a true audit for 1987 constituted a breach, and we affirm that finding as it is not manifestly wrong in fact and is consistent with the law. CHC has sought forfeiture in accord with the lease procedure; the lease mandates forfeiture and therefore, it should be terminated.
Furthermore, concerning El-Ark's alleged loss upon cancellation of the lease, we call attention to the following provision in the lease:
C. In the event of any default not cured within the period allowed as to notice to LESSEE, LESSOR shall have the right to declare the LESSEE'S rights of possession forfeited, and then all of LESSEE'S rights shall thereupon entirely cease and terminate without further written notice. In such event, it shall be lawful for LESSOR to re-enter and take possession of said premises and remove all persons and property therefrom. LESSOR may, after taking possession, as aforesaid, at LESSOR'S option and without prejudice to LESSOR of any other remedies at law which it might have for the collection of rents or damages occasioned by a breach of the covenants on the part of the LESSEE, re-let said premises or any part for such term and at such rental and upon such other terms and conditions as LESSOR in its sole discretion may deem advisable. Any claim for damages occasioned by such removal is expressly waived by the LESSEE. In the event of such forfeiture and re-letting, LESSEE shall continue to be liable to the LESSOR for any deficiency, if any, in rentals obtained from a new or substitute lessee, and the rentals provided by this Lease are to be paid by LESSEE, together with all expenses occasioned by LESSOR by reason of LESSEE'S breach, including reasonable attorney's fees. It is understood and agreed that any and all remedies given the LESSOR hereunder are cumulative, and the exercise of one right or remedy shall not impair its rights to any other remedies.
(Ex. P-1 Lease Agreement p. 5) (Emphasis added.)
Collateral to our reasoning on the forfeiture issue is the question of when may a party avoid a contractual forfeiture provision based on principles of equity. Apparently, the chancellor deemed it adequate to require the tenants in the future to comply with the accounting procedures needed for a proper audit, as suggested by an accounting firm which "attempted" to audit the 1987 revenues. The chancellor awarded no money damages to CHC. The problem with this is that it provides no remedy for the inadequate audit for the 1987 revenues. Based on the record before us, this breach cannot be remedied: since inadequate records were kept, CHC will never be able to confirm the revenue figures by an audit. Hence, it is impossible to place CHC back into the position it should have been in under the contract.
The maxim, equity abhors a forfeiture, is recognized by Mississippi jurisprudence. Citizens' Bank of Hattiesburg v. Grigsby, 170 Miss. 655, 666, 155 So. 684 (1934). It is wise to avoid forfeitures. And this doctrine may be applicable even where a contract mandated forfeiture. Fullerton Greenview Amusement Corp. v. Hollywood Bldg. Corp., 305 Ill. App. 452, 27 N.E.2d 641 (1940). However, this doctrine generally applies in those situations where the alternative *610 to forfeiture is an equitable remedy to the complaining party, i.e., the return to the position he would have been in had the breach not occurred. Paeff v. Hawkins-Washington Realty Co., 320 Mass. 144, 148 67 N.E.2d 900, 166 A.L.R. 804 (1946). Where the damages cannot be calculated with reasonable precision, relief against forfeiture will not normally be given. POMEROY'S EQUITY JURISPRUDENCE, Vol. 1, § 450, at p. 855 (4th Ed. 1918).
Where there is legal authority, whether primary authority or private/contractual authority, which calls for forfeiture, and there is no equitable alternative to forfeiture, forfeiture will be granted.
The chancellor's finding that CHC as plaintiff did not prove damages with reasonable certainty was manifestly wrong, since the main complaint was the failure of the tenants to properly account for their profits from the motel. The only way CHC could have proved their damages was through reliable records of the tenants' business profits. It is obvious that that was why the lease provision which required a certified public accountant's audit provided such a stiff penalty, forfeiture. Without these audits, there was no way for CHC to confirm the revenue percentage due under the lease. Therefore, the only alternate remedy is forfeiture.
Accordingly, we reverse and render a judgment of forfeiture in favor of CHC and cancel the lease dated July 1979. Hence, El-Ark Corporation and all of its assignees and sublessees and creditors forfeit their rights grounded in this lease agreement.

II. EXPERT & ATTORNEY FEES[3]
Item IX., Paragraph C. of the lease agreement states in part,
In the event of such forfeiture and reletting, LESSEE shall continue to be liable to the LESSOR for any deficiency, if any, in rentals obtained from a new or substitute lessee, and the rentals provided by this Lease are to be paid by LESSEE, together with all expenses occasioned by LESSOR by reason of LESSEE'S breach, including reasonable attorney's fees. It is understood and agreed that any and all remedies given the LESSOR hereunder are cumulative, and the excercise of one right or remedy shall not impair its rights to any other remedies.
(Ex. P-1 Lease Agreement p. 5) (Emphasis added.) This Court, as explained previously, has determined that El-Ark has defaulted and the lease is forfeited according to its provisions. According to the lease, CHC is entitled to all expenses arising out of the breach, including attorney's fees. We find that the intent of the parties manifest in the language of this provision entitles CHC to its attorney's fees and expert fees. We hold that CHC should receive the cost of its expert witness, which expense was reasonably incident to this litigation, which stemmed from the breach of the lease agreement.
Therefore, as to this issue, we reverse and remand for a determination of the proper amount of attorney's fees and expert costs.

III. BUS STATION DEMOLITION[4]
The chancellor concluded that CHC had acquiesced in the demolition of this building. El-Ark raised on cross-appeal the issue of whether CHC expressly or impliedly acquiesced in the demolition of the bus station. El-Ark apparently raised this issue in response to statements by CHC in its original appellant's brief. However, CHC states in its cross-reply that it did not mean to appeal the chancellor's finding on this issue; CHC had mentioned the surrounding facts of the bus station only to corroborate its argument about the course of dealings between the parties. CHC admitted that reversal would have been proper only upon a showing of abuse of discretion, and CHC did not allege that the chancellor was manifestly wrong *611 with respect to his decision on the bus station lot. Therefore, the chancellor's judgment on this issue is affirmed.

CONCLUSION
The chancellor's finding that the result of the mandate of the lease was unconscionable is reversed, and a judgment of forfeiture is rendered. The chancellor's denial of attorney's fees and expert fees is reversed, and the case is remanded for a determination of the proper amount of these expenses. The chancellor's finding that CHC acquiesced in the demolition of the bus station is affirmed.
ON DIRECT APPEAL: REVERSED AND RENDERED IN PART; AND REVERSED AND REMANDED IN PART.
ON CROSS-APPEAL: AFFIRMED IN PART.
HAWKINS, C.J., and PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
DAN M. LEE and PRATHER, P.JJ., not participating.
NOTES
[1] For these reasons, CHC's third issue on appeal has no merit. This assignment of error is as follows:

Issue 3. "The Chancellor erred in failing to grant Columbus Hotel Company's Motion for Summary Judgment of Possession."
(Appellant, CHC, third assignment of error.) The basis for this question was the claim of misrepresentation. This has no merit because El-Ark Corporation is an Arkansas corporation, and the clerical error was corrected by the Chancellor's ruling.
[2] The Appellant, CHC, raised four issues, which we name Issue 1., Issue 2., Issue 3., and Issue 4. Cross-Appellants, El-Ark, et al., likewise raised four issues, which we name Cross Issue 1., Cross Issue 2., Cross Issue 3., and Cross Issue 4. Under this subheading, we render an opinion which merges the following issues as stated by the parties on direct appeal and cross appeal.

Issue 1. "The Chancellor failed to apply the law to the facts in denying Columbus Hotel Company its contractual right to forfeiture of the lease after finding that there was an unexcused breach of the lease by the lessee."
(Appellant, CHC, first assignment of error.)
Cross Issue 1. "The doctrine of equitable estoppel and waiver prevent the landlord from enforcing the audit requirement for the 1987 and 1988 calendar years."
(Cross-Appellant, El-Ark, et al., first assignment of error.)
Cross Issue 2. "Forfeitures are abhorred by courts of equity and the only relief afforded to the landlord is provable damages."
(Cross-Appellant, El-Ark, et al., second assignment of error.)
Cross Issue 3. "The tenant has fully complied with the lease and provided the required audit."
(Cross-Appellant, El-Ark, et al., third assignment of error.)
The following assignment of error is rendered moot by our conclusion that a judgment of forfeiture is proper. It is also noted that defendant Smotherman did, in fact, raise the affirmative defense of estoppel. (Response to Plaintiff's Complaint, Legal Papers, 53, 56).
Issue 2. "The Chancellor erred in failing to strike and in allowing First Federal to present the affirmative defenses of First Federal, the City and Mauck, which defenses were personal to Pierce, White, and Smotherman and not pled by them."
(Appellant, CHC, second assignment of error.)
[3] The assignment of error discussed under this subheading, raised by CHC, Appellant, is as follows:

Issue 4. "The Chancellor erred in denying Columbus Hotel Company it's expert witness fees and attorney's fees."
(Appellant, CHC, fourth assignment of error.)
[4] This issue, raised on appeal by El-Ark, et al., reads as follows in El-Ark's brief:

The landlord expressly or impliedly acquiesced in the demolition of the bus station.
(Cross Issue 4., Cross-Appellants, El-Ark, et al., fourth assignment of error.)