# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 22, 2024

Lyle W. Cayce
Clerk

————————

No. 22-60498

————————

Affordable Care, L.L.C.,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

JNM Office Property, L.L.C.,

*Defendant—Appellee/Cross-Appellant*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:19-CV-827

———————————————————————

Before King, Willett, and Douglas, *Circuit Judges*.

Per Curiam:[*]

Longtime business partners Affordable Care, LLC, and JNM Office Property, LLC, entered into a twelve-year lease of commercial property. Six years in, the relationship deteriorated, with each party accusing the other of breaching the lease. Affordable Care sued. JNM counterclaimed. And a jury awarded Affordable Care compensatory and punitive damages. Both parties

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-60498

now appeal, challenging the jury's award and the district court's earlier summary-judgment rulings.

We AFFIRM (1) the district court's order granting summary judgment in favor of JNM on Affordable Care's claim for reimbursement of overpayment of rent; (2) the district court's order granting summary judgment in favor of Affordable Care on its request for a declaratory judgment that the lease is in effect and has not been terminated; and (3) the district court's order denying in part JNM's motion for judgment as a matter of law on the issue of punitive damages. We VACATE the district court's dismissal of JNM's counterclaim for breach of contract and REMAND with instructions for the district court to consider in the first instance whether Affordable Care breached the lease and whether JNM is entitled to damages.

## I.

## A.

Affordable Care, LLC ("Affordable Care") is a "dental support organization" that provides nonclinical business support services to dentists and dental practices. It contracts with dental practices to provide office space, dental equipment, and other business services to help dentists establish their practices. Affordable Care often staffs its own denture laboratories inside the dental practices it contracts with.

In 2002, Affordable Care entered into a Management Services Agreement ("MSA") with a Mississippi dental practice (the "Practice") owned by Dr. Raeline McIntyre ("Dr. Raeline"). Under the MSA, Affordable Care provided dental equipment, supplies, and staff to the Practice. From 2002 until 2014, Affordable Care rented office space located on Orange Grove Road in Gulfport, Mississippi, and sublet the space to the Practice.

No. 22-60498

In 2007, Dr. Raeline and her husband, Dr. Neil McIntyre ("Dr. Neil"), formed JNM Office Property, LLC ("JNM") to build their own office space. In May 2013, the McIntyres purchased land to build the office at 505 Cowan Road in Gulfport, Mississippi. Two months later, while the building was still under construction, JNM and Affordable Care entered into a written lease agreement, in which JNM agreed to lease to Affordable Care the office space at Cowan Road (the "Premises"). Affordable Care then sublet the Premises to the Practice and staffed its own dental laboratory on the Premises.

The lease's rent and default provisions are at issue in this appeal.

Affordable Care agreed to pay "[a]ll rent payable" to JNM "without set off or deduction," but the lease did not specify the amount that would be due each month. Instead, the "minimum annual rent" was to be calculated by "adding the Land Cost, the Cost of Construction, and the [Construction Financing Costs] and multiplying the sum by an investor return of 10.25%."[1] The minimum annual rent was payable in equal monthly installments, on or before the first business day of each month. Affordable Care would be charged a 5% late fee for any rent received after the fifteenth of the month. Additionally, the lease provides that, at the beginning of Rent Year 6, the annual rent would be adjusted based on the Consumer Price Index ("CPI").

The lease established three scenarios under which Affordable Care could default. Affordable Care would be in default if (1) it "fail[ed] to pay any rental payment as provided in [the lease] and continue[d] to fail to pay such rental for five (5) days following [Affordable Care's] receipt of notice from [JNM] to that effect"; (2) it breached any other agreement under the lease and failed to cure within thirty days after notice from JNM; or (3) it

_____

[1] All three terms are defined in the lease.

3

consented to the appointment of a conservator or receiver for more than sixty days. If Affordable Care defaulted under any of these three scenarios, JNM could terminate the lease or repossess the Premises. In addition, if Affordable Care defaulted by failing to pay rent, JNM could accelerate all payments of rent due over the remaining term of the lease.

The lease required the parties to create an addendum establishing a "calculated rent schedule." But they never did. Instead, they calculated rent as follows: Affordable Care took possession of the Premises on August 28, 2014, while the building was still under construction. Because the project was incomplete, Rick Edwards, the son of Affordable Care's founder, asked Dr. Neil what the cost of the construction was, and Dr. Neil estimated that it was "somewhere around 2.5 million." Affordable Care then calculated the monthly rent for the Premises using this estimate and informed JNM that it would pay $21,354.16 per month. Affordable Care made its first rental payment in September 2014, and paid this amount for the first five years that it possessed the Premises. During those five years, Affordable Care never objected to the amount of the monthly rent.

On September 1, 2019, the first month after Affordable Care had possessed the Premises for five years, Affordable Care again sent a rent payment of $21,354.16. The payment did not include the CPI adjustment. On September 18, Dr. Raeline advised Affordable Care that the Practice was terminating the MSA and requested that Affordable Care provide a plan for an orderly disaffiliation. Affordable Care disputed that there was just cause for the termination. The next week, JNM sent Affordable Care a letter notifying it that it was in default for failing to pay the CPI increase for September 2019.

Affordable Care again paid JNM the unadjusted rent for October. On October 24, JNM sent Affordable Care a follow-up letter, informing it that

JNM was declaring Affordable Care to be in total default and demanding acceleration of the remaining rent owed under the lease. Six days later, Affordable Care paid the September 2019 CPI increase and past due rent, including late fees.

## B.

In November 2019, Affordable Care sued JNM in the United States District Court for the Southern District of Mississippi. Affordable Care sought a declaratory judgment that the lease was still in effect and that it did not default because JNM had not given proper notice of the nonpayment of rent. Affordable Care later amended its complaint to add a claim for reimbursement of rent overpayments, alleging that JNM failed to correctly calculate the annual rent and that Affordable Care relied on JNM's "misrepresentations" as to the amount of rent due. JNM asserted a counterclaim for breach of contract based on Affordable Care's failure to timely pay all rent due, and sought an order requiring Affordable Care to vacate the Premises and pay the accelerated rent.

One month into litigation, the parties filed a joint stipulation agreeing that, while litigation was ongoing, Affordable Care would remain in possession of the property and pay JNM monthly rent of $22,731.47, representing the "original rent amount claimed to be due, plus a CPI increase demanded by JNM." But on February 24, 2020, Dr. Raeline again informed Affordable Care that the Practice was terminating the MSA. And three days later, Dr. Raeline removed Affordable Care's signage from the building, locked the door to Affordable Care's dental lab, and told an Affordable Care employee that he could not enter. That same day, the McIntyres obtained a temporary restraining order from a Mississippi state court prohibiting Affordable Care from interfering with Dr. Raeline's practice until March 8, 2020.

On March 17, 2020, however, a federal district court granted Affordable Care's motion to enforce the parties' joint stipulation and ordered JNM, the McIntyres, and the Practice to vacate the Premises by March 27. Affordable Care then filed a second amended complaint in which it added breach-of-contract and wrongful-eviction claims against JNM for excluding Affordable Care from the Premises in violation of the parties' joint stipulation.

Both parties moved for summary judgment on JNM's counterclaim for breach of contract. And Affordable Care separately sought summary judgment on its claim for rent overpayments.

As to JNM's counterclaim for breach of contract, the district court granted Affordable Care's motion for summary judgment, concluding that Affordable Care did not materially breach the lease, so Affordable Care was entitled to a declaratory judgment that the lease was still in full force and effect. The district court did not address any of Affordable Care's alternative arguments. As to Affordable Care's claim for reimbursement of rent overpayments, the district court granted JNM's motion for summary judgment, concluding that Affordable Care waived the right to seek reimbursement.

Only Affordable Care's breach-of-contract claim remained for trial.[2] A jury returned a verdict for Affordable Care, awarding $80,791 in compensatory damages and $120,000 in punitive damages. After trial, JNM filed a renewed motion for judgment as a matter of law, asking the court to vacate the punitive damages award or reduce it to comply with Mississippi's

_____

[2] The parties did not challenge this claim in their summary judgment motions.

statutory cap on punitive damages. The court granted the motion in part, reducing the award to $27,518.60.

## II.

Both parties now appeal. Affordable Care appeals the dismissal of its claim for reimbursement of rent overpayments. And JNM asserts two issues on appeal. It argues that the district court erred by (1) granting Affordable Care's motion for summary judgment on its declaratory judgment claim and dismissing JNM's breach-of-contract counterclaim; and (2) denying in part JNM's motion for judgment as a matter of law on punitive damages.

We review summary judgment *de novo*, applying the same standard as the district court. *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

We start with Affordable Care's appeal.

### A.

Affordable Care argues that the district court erred by granting summary judgment on its claim for reimbursement of rent overpayments because (1) it did not waive its claim, but (2) even if it did, it can challenge ongoing overpayments from the time it filed its first amended complaint, and (3) regardless, JNM should be estopped from arguing waiver. All three arguments fail.

### 1.

First, waiver. The Mississippi Supreme Court "has long held that a party to a contract may by words or conduct waive a right to which he would otherwise have been entitled." *Canizaro v. Mobile Commc'ns Corp. of Am.*, 655 So. 2d 25, 29 (Miss. 1995) (citing *Mariana v. Hennington*, 90 So. 2d 356,

362 (Miss. 1956)); *Sanderson Farms, Inc. v. Gatlin*, 848 So. 2d 828, 837 (Miss. 2003) ("[I]t is simple contract law that a party may waive the protections of any provision of a contract."). Under Mississippi law, waiver is "'an intentional surrender or relinquishment' of a known and existing right, and 'contemplates something done designedly or knowingly, which modifies or changes existing rights, or varies or changes the terms and conditions of a contract. It is the voluntary surrender of a right.'" *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 212–13 (5th Cir. 2009) (quoting *Taranto Amusement Co. v. Mitchell Assocs., Inc.*, 820 So. 2d 726, 729–30 (Miss. Ct. App. 2002)).

To determine whether a waiver has occurred, we look to the parties' "actions and pattern of conduct." *Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100, 1112 (Miss. 2007). For JNM to establish waiver, it must show that Affordable Care's actions or omissions "fairly evidenc[ed] an intention permanently to surrender the right alleged to have been waived." *Wiley*, 585 F.3d at 213 (quoting *Taranto Amusement*, 820 So. 2d at 730); *see also Titan Indem. Co. v. Hood*, 895 So. 2d 138, 150–51 (Miss. 2004). Accordingly, "[t]o determine the point at which any waiver occurs," we look to Affordable Care's actions "after [it] ha[d] sufficient information to be on notice of the alleged deviation from the contractual duty." *Upchurch Plumbing*, 964 So. 2d at 1112 (citing *Brent Towing Co. v. Scott Petroleum Corp.*, 735 So. 2d at 355, 358 (Miss. 1999)); *see also Sanderson Farms*, 848 So. 2d at 837 ("[W]aiver may be inferred from the actions and conduct of the parties." (alteration in original) (quoting *Brent Towing Co.*, 735 So. 2d at 359)). If Affordable Care failed to "insist on its contractual rights, or act[ed] inconsistently with such rights" after it "acquir[ed] knowledge of the deviation from a known right articulated in the contract," then it has "waive[d] the right to require such performance." *Upchurch Plumbing*, 964 So. 2d at 1112. "Ignorance of a material fact negatives waiver, and waiver cannot be established by a consent given under a mistake or a

misapprehension of fact." *Dixie Ins. v. Mooneyhan*, 684 So. 2d 574, 582 (Miss. 1996) (quoting 28 Am. Jur. 2d *Estoppel & Waiver* § 158) (citing *Ewing v. Adams*, 573 So. 2d 1364, 1369 (Miss. 1990)).

Affordable Care argues that it could not have waived its right to challenge the overpayments for two reasons. First, it claims that JNM misrepresented the total construction costs. It contends that Dr. Neil's estimate of $2.5 million in construction costs resulted in overpayments in excess of $300,000. And second, it claims that JNM never gave Affordable Care the necessary information to properly calculate the monthly rent. According to Affordable Care, the McIntyres made "lavish improvements to the Premises" that were not contemplated by the parties' agreement, and JNM was the only party with knowledge of the total construction costs. Affordable Care contends that it had no reason to question its longtime business partner until JNM acted in "bad faith" regarding the CPI increase and attempted to terminate the lease. It was then that Affordable Care was alerted to the fact that JNM might not have been forthcoming about the construction costs. Affordable Care promptly investigated JNM's representations and immediately filed suit.

We agree with the district court. For one, as JNM notes, it is undisputed that Affordable Care knew that under the lease, it had a right for the rent to be calculated based on a defined formula. And Affordable Care knew that the rent it paid for the first five years of the lease was not based on the formula but was instead based on an estimate that was provided before final construction costs were calculated. Affordable Care's contention that it lacked sufficient information because of JNM's "fraud" or "misrepresentations" is belied by the evidence, which shows that Affordable Care knew the calculation was an estimate, and is inconsistent with Affordable Care's right under the lease to act as JNM's agent.

Affordable Care's argument rests largely on Dr. Neil's testimony. Affordable Care claims that "Dr. Neil McIntyre testified that in the summer of 2014, he verbally represented to Affordable that total costs of the project were $2,500,000.00." But Affordable Care misstates the record. Dr. Neil testified that he told Rick Edwards that construction was ongoing and that he did not have the total costs. Edwards demanded a number to use to calculate the rent, so Dr. Neil told him that "all in" he estimated the total costs would be "somewhere around 2.5 million." All parties understood that it was an estimate. Indeed, eighteen months into the lease, internal discussions at Affordable Care highlighted the lack of construction-cost information, but Affordable Care still did not insist on calculating the rent using the lease's formula at that point. Nor does Affordable Care point to any evidence that it tried to enforce its rights under the lease. Instead, it admits that it did not object to the monthly rent until September 2019, when JNM demanded the CPI increase.

What's more, under the lease, Affordable Care was allowed to act as JNM's agent "in all aspects of the construction procedures," and agreed to "review all applications for payment payable for work completed throughout the construction process." Affordable Care's rights under the lease further undercut its argument that JNM's misrepresentations prevented it from having requisite knowledge to waive its right to challenge rent amounts.

Despite knowing that the $2.5 million figure was an estimate and knowing that the parties never created the addendum setting the rent schedule, Affordable Care never bothered to object to, or clarify, the rent amount. It was Affordable Care that calculated the rent based on Dr. Neil's estimate, and it was Affordable Care that informed JNM of the amount it would pay in monthly rent. Affordable Care thus acted inconsistently with its

known rights under the lease to have the rent calculated as defined in the lease and waived its right to sue for reimbursement of alleged overpayments.[3]

**2.**

In an attempt to save its waived claim, Affordable Care contends that JNM should be equitably estopped from arguing waiver. The district court did not address this argument. But it doesn't save Affordable Care's claim.

Equitable estoppel "is an extraordinary remedy to be used with caution." *Olshan Found. Repair Co. of Jackson v. Moore*, 251 So. 3d 725, 730 (Miss. 2018) (internal quotation omitted); *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 740 (Miss. 2019); *Powell v. Campbell*, 912 So. 2d 978, 982 (Miss. 2005) ("[E]stoppel should only be used in exceptional circumstances and must be based on public policy, fair dealing, good faith, and reasonableness."). It requires proof "(1) that [a party] has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance upon such conduct." *Gulf Coast Hospice*, 273 So. 3d at 740 (quoting *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 206 (Miss. 1984)). But critically, "reasonableness on the part of the party seeking the benefit of [the doctrine's] application is expected." *Wayne Griffin & Sons, Inc. v. U.S. Fid. & Guar. Co.*, No. 3:93CV97-B-A, 1995 WL 1945483, at *4 (N.D. Miss. Jan. 9, 1995) (citing

---

[3] *Cf., e.g.*, *Bennett v. Waffle House, Inc.*, 771 So. 2d 370, 372–73 (Miss. 2000) (holding that a landlord waived right to object to tenant's alleged violation of lease by waiting nearly fifteen years to object); *Vice v. Leigh*, 670 So. 2d 6, 10–11 (Miss. 1995) (holding that landlord waived right to object to tenant's multiple lease violations over several years of lease term where the landlord waited to object until near the end of the lease term); *Edwards Fam. P'ship, L.P. v. BancorpSouth Bank*, 236 F. Supp. 3d 964, 973 (S.D. Miss.), *aff'd*, 699 F. App'x 312 (5th Cir. 2017) (holding that plaintiffs waived their right to force the bank to perform under the contract because they knew the bank was deviating from the terms of the contract but "did nothing to correct or even contest the breach").

*PMZ Oil*, 449 So. 2d at 206); *see also Solomon v. Walgreen Co.*, 975 F.2d 1086, 1091 (5th Cir. 1992) (noting that equitable estoppel "requires reasonableness").

Affordable Care argues that JNM should be estopped from arguing waiver because (1) Affordable Care relied on Dr. Neil's representation that the total costs were $2.5 million; and (2) Affordable Care "had no obligation to independently investigate JNM's representation about costs." Without estoppel, it claims, JNM will be unjustly enriched by its wrongful conduct.

This is not a case for the "extraordinary remedy" of estoppel. As explained above, Affordable Care misstates the record about Dr. Neil's estimate, it had the right to act as JNM's agent "in all aspects of the construction procedures," and it agreed to "review all applications for payment payable for work completed throughout the construction process." For the same reasons that Affordable Care waived its claim for overpayments, we decline to apply equitable estoppel.

**3.**

Finally, Affordable Care argues that even if it waived its claims, it has a right to recover overpayments from the time it filed its amended complaint, on December 2, 2019. But Affordable Care forfeited this claim because it did not raise it to the district court. We do not consider arguments raised for the first time on appeal. *Est. of Duncan v. Comm'r*, 890 F.3d 192, 202 (5th Cir. 2018); *Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018) ("[A]rguments not raised before the district court are [forfeited] and cannot be raised for the first time on appeal." (internal quotation omitted)).

We conclude that the district court properly granted summary judgment for JNM on Affordable Care's claim for reimbursement based on alleged overpayments of rent.

No. 22-60498

**B.**

Next, we turn to JNM's cross-appeal. We first consider whether the district court erred by granting Affordable Care's motion for summary judgment on JNM's counterclaim for breach of contract. The district court concluded that, because Affordable Care did not materially breach the lease, Affordable Care was entitled to a declaratory judgment that the lease was valid and in effect.

Under Mississippi law, termination of a contract is generally permitted only when a breach is material because termination "is an 'extreme' remedy that should be 'sparsely granted.'" *UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp., Inc.*, 525 So. 2d 746, 756 (Miss. 1987) (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976)); *see also Ferrara v. Walters*, 919 So. 2d 876, 886 (Miss. 2005); *Harvey v. Caesars Ent. Operating Co.*, 55 F. Supp. 3d 901, 907 (N.D. Miss. 2014), *aff'd*, 790 F. App'x 582 (5th Cir. 2019). The same is true in the context of leases: "A tenant's right to possession may not be conditioned on perfect performance of the lease but may be forfeited only upon a material breach or a violation of a substantial obligation . . . ." *Watkins Dev., LLC v. Jackson Redevelopment Auth.*, 283 So. 3d 170, 175 (Miss. 2019) (quoting 52 C.J.S. *Landlord & Tenant* § 189 (2019)). Forfeiture cannot be justified by an "immaterial or trivial breach, or a relatively minor failure of performance on the part of one party." *Id.* (quoting 52 C.J.S. *Landlord & Tenant* § 189 (2019)).

In its cross-appeal, JNM primarily argues that it was entitled to terminate the lease pursuant to the lease's express termination provision, regardless of whether Affordable Care's breach was material.[4] Affordable

---

[4] Termination clauses are generally enforceable under Mississippi law. *See Columbus Hotel Co. v. Pierce*, 629 So. 2d 605, 608–09 (Miss. 1993) ("Even though [forfeiture] may be harsh, the result will be enforced when mandated by a legally valid

Care counters that the Supreme Court of Mississippi's precedent in *UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc.*, which held that a termination clause "should have implied into it the concept of material breach," is dispositive. *See UHS-Qualicare*, 525 So. 2d at 755–56. Because *UHS-Qualicare* lies at the heart of the parties' dispute, we review the case in detail.

In *UHS-Qualicare*, the Supreme Court of Mississippi considered a twenty-year hospital management contract which contained the following termination provision:

> If manager shall fail to keep, observe or perform any material covenant, agreement, term or provision of this agreement to be kept, observed or performed by a manager, and such default shall continue for a period of thirty (30) days after written notice thereof by corporation to manager, then in case of any such event and upon the expiration of the aforesaid thirty (30) day period, this agreement shall terminate at any time thereafter upon notice to manager by the corporation in writing.

*Id.* at 755. Because one of the parties breached the contract "in a technical sense," the court addressed whether "that breach was the sort of breach of contract which justifies the radical remedy of termination." *Id.* The court noted that the word "material" in the provision modified "covenant,

---

contract."); *Clark v. Serv. Auto Co.*, 108 So. 704, 706 (Miss. 1926) ("[N]onpayment of rent does not operate in the absence of a provision therefor in the lease as a forfeiture of the term or confer upon the lessor the right of re-entry. But, where there is a provision in the lease for forfeiture and re-entry for nonpayment of rent, such a provision is valid and enforceable."); *see also Kirkland v. Chinita Land Dev., Inc.*, 798 So. 2d 620, 621–22, 624 (Miss. Ct. App. 2001) (holding that a landlord did not waive his right to seek termination by accepting late payments where contract allowed termination without notice following a default by the lessee for more than fifteen days and such default occurred). We express no opinion on whether *this* termination clause is enforceable.

agreement, term or provision," but that no such word appeared prior to the words "'fail to keep, observe or perform . . . .', i.e. breach." *Id.* The court concluded:

> We think it established law . . . that a clause such as this should have implied into it the concept of material breach. The fact that the termination clause is limited to "material" covenant, agreement, etc. in no way answers whether the breaches must also be material.
>
> Absent clear language to the contrary, we regard it wholly unreasonable that the language of a twenty year, multimillion dollar contract, be read to provide that any failure (whether material or not) to keep, observe or perform, etc. will suffice to trigger the termination clause. Such a result would be productive of great economic waste. An implied requirement that breaches justifying termination be material is only fair, while the contrary reading could only produce harsh, unreasonable, expensive and *unintended* consequences. The concept of material breach is sufficiently familiar and well-known that contracting parties and their drafting attorneys are charged with knowledge of it. If they wish to exclude it from their contract, they must do so clearly.

*Id.* at 755–56.[5]

The court therefore regarded the "best legal reading" of the termination clause to be:

---

[5] We briefly note that Mississippi courts have applied *UHS-Qualicare*'s holding on the implied materiality requirement to leases. In *Ladner v. Pigg*, 919 So. 2d 100, 103 (Miss. Ct. App. 2005), the Mississippi Court of Appeals acknowledged the general principle that provisions for forfeiture and reentry for nonpayment of rent are valid and enforceable. (citing *Clark*, 108 So. at 706). However, the court concluded that while a "lease provision for forfeiture and re-entry for nonpayment of rent is valid and enforceable in certain situations, the court cannot terminate a contract absent a material breach." *Id.* (citing *UHS-Qualicare*, 525 So. 2d at 756).

> If manager shall . . . [breach materially] any material covenant, agreement, term or provision of this agreement . . . .

*Id.* at 756.

Conscious of our duty as a federal court sitting in diversity to look to the final decisions of Mississippi's highest court to guide our judgment, *see Am. Int'l Specialty Lines Ins. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003), we agree with Affordable Care that the Supreme Court of Mississippi's holding in *UHS-Qualicare* is dispositive.

We begin with the text of the lease. In relevant part, it says:

> If Tenant (a) fails to pay any rental payment as provided in this Agreement and continues to fail to pay such rental for five (5) days following Tenant's receipt of notice from Landlord to that effect; . . . then in addition to any other lawful right or remedy which Landlord may have, Landlord may without further notice do the following: terminate this Agreement, or repossess the Demised Premises, . . . . In the event of a default as described in (a) above, Landlord may elect to declare Tenant in total default under this Agreement and accelerate all installments of rent due over the remaining term of the lease.

In reading the language of this termination provision, we cannot conclude that the parties "clearly" excluded the requirement of material breach.[6] The language of this provision makes no mention of materiality.

---

[6] "Questions of contract construction and ambiguity are questions of law rather than questions of fact." *Gulf Coast Hospice*, 273 So. 3d at 735–36. Under Mississippi law, we look to the "four corners" of the contract wherever possible to determine how to interpret it, and "[o]ur concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (Miss. 2005).

JNM notes that the lease sets out three possible events of default: (1) failure to pay rent not cured within five days; (2) breach of any other term not cured, or at least subject to efforts to cure, within thirty days; and (3) appointment of a receiver or conservator for at least sixty days. As JNM correctly points out, the lease provides distinct terms for breach due to nonpayment. Affordable Care has a shorter window to cure a failure to pay rent, and a default due to nonpayment is subject to an acceleration remedy. But we are not convinced that the different terms for breach due to nonpayment *clearly* indicate an intent to dispense with the implied materiality requirement. The shorter window to cure nonpayment could just as easily reflect the fact that this is a more predictable form of default that warrants a streamlined process for claiming breach and being entitled to damages. And the Supreme Court of Mississippi's reasoning that absent "clear language" to the contrary, it would be "wholly unreasonable" for a long-term, high-value contract to be terminated by a trivial breach prevents us from concluding without clearer indication that the parties intended for even the slightest underpayment to trigger "total default" and acceleration.[7] *See UHS-Qualicare*, 525 So. 2d at 756.

The lease's provision that "fail[ure] to pay *any* rental payment" may trigger termination also does not definitively establish that the parties intended to dispense with the implied materiality requirement. (emphasis added). It is unclear whether "any rental payment" means any *magnitude* of

---

[7] Though we decline to address the question without clearer guidance from Mississippi law, we note that an acceleration clause triggered by an objectively minor breach may not be enforceable. Myron Kove, 1 Real Estate Transactions: Structure and Analysis with Forms § 3:111 (2023) ("The right to accelerate upon a minor default by the tenant is not normally permitted, since this extreme remedy is likely to be deemed an unenforceable penalty by a court even when the principle of acceleration is recognized by the particular state.").

rental payment, or whether it means any *instance* of rental payment.[8] In *UHS-Qualicare*, the Supreme Court of Mississippi examined a provision where there were no modifiers before the words "fail to keep, observe or perform," i.e., the language indicating breach. *Id.* at 755. We face the same issue here: It is unclear if the word "any" modifies the language indicating breach, i.e., "*fail*[*ure*] to pay." If we read "any rental payment" to mean any *instance* of rental payment, we can insert into the provision the concept of material breach:

> If Tenant (a) [materially] fails to pay any rental payment as provided in this Agreement and continues to fail to pay such rental for five (5) days following Tenant's receipt of notice from Landlord to that effect; . . . .

The upshot of this word dissection is that this lease's termination clause is, at best, ambiguous. The question we are tasked with answering is whether the parties, through this language in their contract, *clearly* excluded implied materiality. We cannot answer that question in the affirmative.

Our conclusion is bolstered by the reasoning adopted by the Supreme Court of Mississippi in *UHS-Qualicare*. The court explained that the implied requirement that only material breaches can trigger termination ensures that long-term, high-value contracts are not swiftly unraveled by trivial breaches. *UHS-Qualicare*, 525 So. 2d at 756. The same reasoning applies here. Affordable Care and JNM entered into a twelve-year, multimillion-dollar contract. It would be extraordinary for such a contract to be terminated by,

---

[8] Affordable Care presents yet another interpretation of the term "fails to pay any rental payment." It claims that, by paying *some* rent, it did not fail to pay *any* rent, therefore clearing the threshold contemplated by the default provision. While we find this interpretation somewhat implausible (Affordable Care could avoid default by paying a trivial amount), the provision's susceptibility to vastly different interpretations underscores its lack of clarity.

say, the failure to cure a five-dollar underpayment. Of course, if the parties wish to dispense with the implied materiality requirement and make such an outcome a possibility, they are free to do so. But "they must do so clearly." *Id.* That did not happen here.

Because we conclude that the parties did *not* clearly exclude the implied materiality requirement, we turn to the issue of whether the district court erred by determining on summary judgment that Affordable Care did not materially breach the lease. The parties agree that Mississippi courts consider the following factors set forth by the Supreme Court of Mississippi in *Watkins Development, LLC v. Jackson Redevelopment Authority* to determine the triviality or non-materiality of a tenant's breach of a commercial lease:

> (1) the extent to which the injured party will be deprived of the benefit that he or she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of that he or she will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his or her failure, taking account of all the circumstances, including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Watkins*, 283 So. 3d at 176 (quoting 52 C.J.S. *Landlord & Tenant* § 189 (2019)).

Because the materiality of a breach is ordinarily a question of fact, *see Hensley v. E. R. Carpenter Co.*, 633 F.2d 1106, 1110 (5th Cir. 1980), JNM contends that the district court erred by ruling at the summary judgment stage that JNM could not show a material breach. According to JNM, a court considering all evidence in the light most favorable to JNM and

drawing all reasonable inferences in JNM's favor could not conclude that Affordable Care's breach was nonmaterial as a matter of law. *See Havarda*, 723 F.3d at 591.

For instance, addressing *Watkins* factor 4, JNM disputes the district court's conclusion that "Affordable Care promptly made offers of cure and repeatedly requested that JNM identify the overdue amount so it could pay the allegedly defaulted amount." JNM counters that Affordable Care could have calculated the CPI increase using the formula in the lease, and that Affordable Care's actions could be interpreted as delay tactics. Addressing *Watkins* factor 5, JNM contends that Affordable Care's conduct was inconsistent with its level of sophistication as both a commercial tenant and a landlord. From JNM's perspective, Affordable Care's tardy payment under protest, delay tactics, and attempt to blame JNM for Affordable Care's own failures all indicate that Affordable Care made "less than a good faith effort at compliance."

We agree that a reasonable jury could potentially conclude that Affordable Care's protestations in paying the CPI increase were unwarranted.[9] But we also must consider the facts that are undisputed. Affordable Care and JNM entered into a twelve-year, multimillion-dollar lease. By all accounts, Affordable Care diligently paid the monthly rent for five years. On September 1, 2019, the first month of Year 6, Affordable Care failed to pay the $1,402.39 CPI increase. But it still paid the base amount of $21,354.16—i.e., approximately 94% of the total rent. Thirty-four days after

---

[9] As discussed below, the legitimacy of Affordable Care's protestations in paying the CPI increase is more relevant to the issue of whether Affordable Care breached the lease *at all*.

receiving notice that it failed to pay the escalated rent, Affordable Care paid the past rent due, plus a late fee contemplated by the lease.

In essence, what occurred here is a dispute over the Year 6 CPI increase, which constituted 6% of the rent. Under these circumstances, even if we take as true JNM's characterization of Affordable Care's actions, we find it very difficult to comprehend that a reasonable jury could conclude that Affordable Care's breach was material. As to *Watkins* factors 1 and 2, it is true that JNM was deprived of a timely rental payment. But the fact that Affordable Care timely paid 94% of the rent significantly diminishes the extent to which these factors—or any of the *Watkins* factors, for that matter—could weigh in favor of JNM. *Watkins* factor 3 clearly favors Affordable Care, since JNM requested termination of the entire contract and acceleration. And while the strength of *Watkins* factors 4 and 5 are in dispute, it is worth noting that JNM has not raised any prior issues with Affordable Care's payments over the course of the first five years of the lease.

We are guided by Mississippi law's significant reticence to permit forfeiture. The typical remedy for breach of contract is money damages, not rescission, and, as discussed above, termination is an "'extreme' remedy that should be 'sparsely granted.'" *UHS-Qualicare*, 525 So. 2d at 756 (quoting *Lipsky*, 551 F.2d at 895); *Watkins*, 283 So. 3d at 174–75. Absent any evidence of prior payment issues, terminating a lease six years in due to a dispute over a CPI increase that resulted in a 6% underpayment strikes us as out of sync with these principles. Substantial performance is judged by "how close the tenant came to meeting its obligations under the lease," and, in the context of a nonpayment breach, 94% payment seems, well, substantial. *See Watkins*, 283 So. 3d at 176. Of course, Affordable Care, if it did breach, should not be let off the hook for this underpayment. But this "relatively minor failure of performance," based on a dispute over the Year 6 CPI increase, is an issue

that could readily be redressed through a damages remedy. *See id.* at 175 (quoting 52 C.J.S. *Landlord & Tenant* § 189 (2019)).

We acknowledge JNM's contention that the plain language of the lease indicates that the parties considered timely payment of rent "vital to the existence of the contract," which supports the conclusion that breach due to nonpayment is material. *See id.* (quoting *Matheney v. McClain*, 161 So. 2d 516, 520 (Miss. 1964)). But the fact that timely payment of rent is vital to a lease generally does not lead us to the conclusion that *any* breach due to nonpayment, no matter how trivial, gives JNM the right to terminate. While there are authorities upholding a landlord's right to terminate a lease due to nonpayment, the instances of nonpayment in these cases tend to be total and/or chronic. *See, e.g.*, *Clark*, 108 So. at 705 (permitting a landlord to take possession of the leased premises after the tenant failed to pay any rent for three consecutive months); *Kirkland*, 798 So. 2d at 622 (detailing a tenant who allegedly failed to make payments for two months, and whose payment checks were chronically late and, at several occasions, were rejected due to insufficient funds).[10]

To summarize, even viewing all evidence in the light most favorable to JNM, we conclude that the district court did not err by concluding that Affordable Care's breach of the lease was not material as a matter of law. To conclude that a first-time failure to pay a small fraction of rent six years into a twelve-year lease warrants the "extreme" remedy of termination would be out of step with Mississippi authorities. *See Watkins*, 283 So. 3d at 174–75.

---

[10] *Cf.* Roland F. Chase, Annotation, *Commercial Leases: Application of Rule that Lease May Be Canceled Only for "Material" Breach*, 54 A.L.R.4th 595, § 12[a] (2024) (collecting cases where nonpayment or late payment of rent was held sufficient to terminate commercial lease, which generally involved total and/or chronic nonpayment of rent); John Francis Major, 7 Am. Jur. Proof of Facts 3d 655, § 9 (2024) (same).

We accordingly AFFIRM the district court's order granting a declaratory judgment that Affordable Care did not materially breach the lease and that the lease remained in full force and effect.

However, we note one issue with the district court proceedings. After determining that Affordable Care did not materially breach the lease, the district court dismissed JNM's counterclaim for breach of contract. While we agree that Affordable Care's breach was not material and that termination was not warranted, we find that the district court did not adequately address whether JNM is entitled to damages for breach of contract. *See id.* at 174 ("The remedy for a breach of contract that is not material is money damages, not rescission."). In its motion for partial summary judgment, in addition to arguing that it did not materially breach the lease, Affordable Care additionally argued that it did not breach the lease *at all*, because (1) JNM suffered no damages; (2) JNM refused to identify the amount claimed due; (3) the commencement date in the lease was never determined; and (4) JNM provided inadequate notice of default. The district court declined to consider these arguments, concluding that "even if Affordable Care breached the lease or technically breached it," no reasonable jury would conclude that "any such breach was material." We agree that it was unnecessary for the district court to consider these arguments when making a holding on the materiality issue, but whether Affordable Care breached the lease *at all* is a separate issue that has not been resolved. We accordingly VACATE the district court's dismissal of JNM's breach-of-contract claim, so that the district court can consider these arguments in the first instance and determine whether JNM may be entitled to damages.

## C.

We finally turn to the issue of punitive damages. A jury awarded Affordable Care punitive damages on its breach-of-contract claim. After trial,

in ruling on JNM's renewed motion for judgment as a matter of law, the district court declined to vacate the punitive damages award. JNM appeals that decision.

Under Mississippi law, a claimant seeking punitive damages must "prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." MISS. CODE ANN. § 11-1-65(1)(a). "Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed 'with caution and within narrow limits.'" *Warren v. Derivaux*, 996 So. 2d 729, 738 (Miss. 2008) (quoting *Life & Cas. Ins. of Tenn. v. Bristow*, 529 So. 2d 620, 622 (Miss. 1988)). "Actual malice" is defined as "[t]he deliberate intent to commit an injury, as evidenced by external circumstances." *Actual Malice*, BLACK'S LAW DICTIONARY (10th ed. 2014).

"We review the denial of a renewed motion for judgment as a matter of law *de novo*, but our standard of review with respect to a jury verdict is especially deferential." *Vetter v. McAtee*, 850 F.3d 178, 185 (5th Cir. 2017). Judgment as a matter of law is proper "if the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable people could not arrive at a contrary verdict." *Id.* We must draw all inferences in favor of Affordable Care, but we may not make credibility determinations or weigh the evidence. *See id.*

In its order denying in part JNM's motion for judgment as a matter of law, the district court held that a reasonable jury could conclude by clear and convincing evidence that JNM acted with actual malice. The district court noted that Dr. Raeline testified "under oath that she planned to evict Affordable from the Property the night before she barred entry to

Affordable's employees, despite knowing that Affordable had a right to occupy the building." It thus concluded that "[e]vidence of planning the eviction with knowledge that it would be in violation of JNM's Lease with Affordable was sufficient evidence for the jury to conclude that JNM acted intentionally and with malice."

In support of the jury's punitive damages award, Affordable Care points to evidence purportedly indicating that JNM acted intentionally and with premeditation when it barred Affordable Care from the Premises. More specifically, Affordable Care points to evidence that Dr. Raeline locked the door to Affordable Care's laboratory inside the Premises, told an Affordable Care employee that he was not allowed in the laboratory, and had planned these actions in advance, despite knowing that Affordable Care had a right to occupy and enjoy the Premises.

JNM, on the other hand, contends that there was no legally sufficient evidentiary basis for a reasonable jury to find actual malice. It points to Dr. Raeline's testimony that JNM continued to practice at the Premises out of concern for the continuity of patient care. It also points to instances in the record where Affordable Care's witnesses admitted that the McIntyres were good doctors who put their patients first, and that patients should not suffer because of a business dispute. Finally, JNM points to an Affordable Care employee's inconsistent testimony about when Affordable Care learned of JNM's desire to disaffiliate.

Affordable Care claims that JNM's arguments are based on the credibility of witnesses, essentially asking this court to credit Dr. Raeline's testimony over that of Affordable Care's witnesses, and that credibility determinations regarding witness testimony are matters for the jury to consider. Although the evidence of actual malice in this case is not overwhelming, we agree. "[I]t is the function of the jury as the traditional

finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *OneBeacon Ins. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016) (quoting *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012)). "The jury is 'free to choose among reasonable constructions of the evidence.'" *Id.* (quoting *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008)). Because there is basis in the evidence for a jury to conclude that JNM acted with actual malice by intentionally barring Affordable Care from the Premises, we cannot conclude that "the facts and inferences point so strongly and overwhelmingly in favor of [JNM]" that JNM was entitled to a judgment as a matter of law on this issue. *See Vetter*, 850 F.3d at 185.

JNM primarily takes issue with the district court's reasoning in denying in part JNM's motion for judgment as a matter of law. For instance, it claims that the district court erred in citing *Eselin-Bullock & Associates Insurance Agency, Inc. v. National General Insurance Co.*, 604 So. 2d 236, 241 (Miss. 1992), which held that a defendant's act of canceling insurance policies with knowledge that it was breaching a contract was an "intentional wrong" that justified sending the issue of punitive damages to the jury. As JNM points out, *Eselin-Bullock* was decided before Mississippi adopted a heightened clear-and-convincing-evidence standard for punitive damages. *See* 1993 Miss. Laws 302, § 2.

We cannot conclude that the district court committed reversible error by citing *Eselin-Bullock* in its order denying in part JNM's motion for judgment as a matter of law. Mississippi courts continue to cite *Eselin-Bullock* in support of the general principle that "punitive damages are recoverable for breach of contract when such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort." *Willard v. Paracelsus Health Care Corp.*, 681 So. 2d 539, 543 (Miss. 1996) (citing *Eselin-Bullock*, 604 So. 2d at 240); *Banks v. S. Farm Bureau Cas. Co.*, 912 So.

2d 1094, 1098 (Miss. Ct. App. 2005) (citing *Eselin-Bullock*, 604 So. 2d at 240); *see also Cox v. Provident Life & Accident Ins.*, 878 F.3d 504, 507 & n.4 (5th Cir. 2017) (citing *Eselin-Bullock*, 604 So. 2d at 241).

At trial, the district court properly articulated the standard for punitive damages. It noted that a "tortious breach of contract requires, in addition to a breach of the contract, some intentional wrong, insult, abuse, or negligence so as to constitute an independent tort," and that for punitive damages to be awarded, "the jury would have to find by clear and convincing evidence that the defendant acted with malice or with gross negligence, which evidences a willful, wanton or reckless disregard for the safety of others or committed actual fraud." Because the district court repeatedly cited the clear-and-convincing-evidence standard for punitive damages—both at trial and in its order denying in part JNM's motion for judgment as a matter of law—and because there is evidentiary support for a jury to conclude that JNM acted "maliciously or with reckless disregard for [Affordable Care's] rights," we cannot conclude that the district court erred by putting this issue before the jury.[11] *See Cain v. Cain*, 967 So. 2d 654, 668 (Miss. Ct. App. 2007). We accordingly AFFIRM the district court's order denying in part JNM's motion for judgment as a matter of law on the issue of punitive damages.

---

[11] Furthermore, we are not persuaded by JNM's argument that punitive damages are inappropriate because it had an "arguable reason" to breach, as JNM has not pointed to any authorities indicating that this "arguable reason" test has any applicability outside the context of cases discussing an insurer's failure to pay a claim. *See State Farm Fire & Cas. Co. v. Simpson*, 477 So. 2d 242, 250 (Miss. 1985) ("[P]unitive damages will not lie if the carrier has an arguable reason for denying the claim."); *Andrew Jackson Life Ins. v. Williams*, 566 So. 2d 1172, 1184 (Miss. 1990) ("[D]etermination of whether to submit a punitive-damages issue to the jury generally will be contingent on a determination of whether the insurer denied the underlying policy or contract claim on an arguable basis.").

No. 22-60498

## III.

For the foregoing reasons, we AFFIRM (1) the district court's order granting summary judgment in favor of JNM on Affordable Care's claim for reimbursement of overpayment of rent; (2) the district court's order granting summary judgment in favor of Affordable Care on its request for a declaratory judgment that the lease is in effect and has not been terminated; and (3) the district court's order denying in part JNM's motion for judgment as a matter of law on the issue of punitive damages. We VACATE the district court's dismissal of JNM's counterclaim for breach of contract and REMAND with instructions for the district court to consider in the first instance whether Affordable Care breached the lease and whether JNM is entitled to damages.